[No. S004706. Crim. No. 25187. July 13, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN DeSANTIS, Defendant and Appellant.

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Musawwir Spiegel, Sandra Gillies and Jay Colangelo, Deputy State Public Defenders, for Defendant and Apppellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Ward A. Campbell and Michael J. Weinberger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—A jury convicted defendant of the first degree murder of Edward Davies (Pen. Code, § 187).[1] The jury specially found that defendant personally and intentionally committed the murder with premeditation and deliberation. The jury found that the murder was committed during a burglary, a special circumstance (§ 190.2, subds. (a)(17)(vii) & (b)), and during a robbery, also a special circumstance (§ 190.2, subds. (a)(17)(vii) & (b)). The jury found defendant guilty of the attempted murder of Grace Davies, Mr. Davies's wife (§§ 664 & 187, subd. (a)). The jury also found defendant

---

[1]Unlabeled statutory references are to this code.

guilty of the second degree burglary of the Davies residence (§ 459), of the robberies of Mr. and Mrs. Davies (§ 211), of the unlawful taking of a vehicle (Veh. Code, § 10851), and of conspiracy to commit robbery (§ 182).

The court found true allegations that defendant had suffered five prior felony convictions: 1967 convictions for grand theft auto and for receiving stolen property, a 1973 conviction for first degree robbery, a 1975 conviction of escape from state prison, and a 1977 Oklahoma conviction for robbery with the use of a firearm. The court found not true a sixth allegation—that defendant was convicted in Oklahoma for injury to a public building, a felony.

The jury deadlocked at the penalty phase and a second jury was impaneled. That jury found that the aggravating factors outweighed the mitigating, and fixed the penalty at death. After denying motions for new trial, to strike the findings of special circumstances, and to reduce the penalty, the court sentenced defendant to death on the murder charge, and imposed prison terms on the other counts.

For reasons that will appear, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase Facts.*

#### 1. *Undisputed Facts.*

Grace and Edward Davies, an elderly couple known to have a cache of precious metals on the premises of their Sacramento home, were eating lunch and watching television in the kitchen in the early afternoon of December 9, 1981, when the doorbell rang. Mrs. Davies survived to relate the events that follow. Mr. Davies did not.

Mrs. Davies answered the call of the bell. A man outfitted with a hard hat and wearing a red or orange jacket or safety vest and a utility belt stood at the door. An accomplice waited in a telephone company truck parked outside. The man at the door, who would soon rob the couple, said he was from the telephone company and needed to repair the Davieses' instrument. Mrs. Davies allowed him to enter. A neighbor observed the truck's arrival from across the street and was in turn noticed by both robbers.

The man located a phone near the kitchen table, stood for a few seconds with his back to the Davieses, and turned around. Mrs. Davies saw he was aiming a small gun at them.

The man ordered the Davieses to lie down on the floor and bound them with handcuffs and cords. He placed towels and other objects over Mrs. Davies's head, apparently to obscure her vision. Later Mrs. Davies felt an object against her throat and heard a voice tell her husband, "I'll cut your old woman's throat if you don't tell me where the gold is."

Sometime thereafter Mrs. Davies heard a noise that she believed to be a gunshot. It came from the direction in which her husband lay. She then felt something placed against her ear through a cloth that was covering her head, and heard the noise of the gunshot that wounded her. She apparently lost consciousness. After coming to, she realized she was touching her husband's leg and could feel it twitch. She called out to him several times, but he did not answer. Perhaps aware that somebody else was in the room, she called out for her painful wrist bindings to be loosened. She then heard another noise, after which she no longer felt her husband's leg twitch. Someone then cut her wrist bindings and took off the handcuffs. Thereafter, Mrs. Davies heard the opening of a door leading from the kitchen to the garage and someone wandering in the house, though she still could not see.

The man who initially came to the door did so about 1:15 to 1:30 p.m. It had become dark outside when Mrs. Davies realized she no longer heard any noises in the house. Though seriously wounded, she retrieved a knife and cut the cords binding her ankles. She tried to call for help but discovered the telephone handset had been cut from the rest of the instrument. Unable or unwilling to go outside in the December cold, she lay on a sofa throughout the night; when dawn broke she crawled out to the sidewalk, where a woman discovered Mrs. Davies's condition and called the police. She was hospitalized for about one month and suffered total loss of hearing in one ear, permanent paralysis on one side of her face, the inability to close one eye, and impairment of her sense of balance.

A pathologist concluded that Mr. Davies probably died from the effect of gunshot wounds to the brain. There was one wound on the left side of his head and one on the right; the left wound was not likely to have been the fatal one. The bullets that inflicted the wounds appeared to be .22-caliber; one was copper—and one lead-colored, but both were too damaged to determine if they were fired from a specific gun.

The robbery netted a considerable amount of property, including silverware, jewelry, silver coins, silver ingots, and guns.

Defendant and his cousin Gary Masse, who the court instructed the jury was an accomplice as a matter of law, planned and executed the Davies

robbery together. Masse had heard from Gloria Killian, reputedly a law student, that the Davieses had a large cache of valuable property on the aboveground premises and might have more buried in the backyard. Killian and others wanted to have someone execute the robbery, split the proceeds with the robbers, and reward them by giving them information that would allow them to commit a much larger robbery in the future.

### 2. *Prosecution Case.*

The prosecution successfully contended that defendant was the man who went to the Davieses' door, the man who shot the couple as Mr. and Mrs. Davies lay on the floor, and the man who later returned to fire the fatal shot into Mr. Davies's head.

The prosecution theorized that Masse and defendant went to the Davies home in a telephone company truck that defendant had stolen the night before. Defendant was wearing telephone company paraphernalia, including a hard hat and utility belt he had shown Masse during a chance meeting in the parking lot of a Sacramento restaurant six days earlier.

Defendant was carrying a small .22-caliber pistol. Masse had been in possession of a larger .22-caliber handgun earlier in the day in preparation for the robbery, but after a previous pass by the Davies residence the two had agreed Masse's gun was too large. They drove to the home of defendant's brother, Robert DeSantis, and left Masse's gun in a van parked in the yard.

While Masse waited in the truck outside, pretending to inspect the truck's inventory in the manner of a telephone company employee, defendant went to the front door and gained entrance. After a few minutes Masse came inside, verified that defendant had everything under control, left to move the truck, and returned. Masse then helped collect property. Defendant had covered the Davieses. Later, with Masse nearby, defendant shot each of the Davieses, firing the initial, nonfatal shot into Mr. Davies. Masse and defendant then drove the Davieses' booty-laden Peugeot to the house of defendant's brother Robert, and put the proceeds in defendant's van. Masse took the Peugeot to the parking lot of a shopping center; Robert gave him a ride back.

After Masse returned, he and defendant decided to retrieve the handcuffs that defendant had left on the Davieses, but had no keys with which to do so. Defendant and Masse drove to a store in downtown Sacramento, where defendant bought a new set of handcuffs, including keys. The two returned to the Davieses' home. Masse waited in the car while defendant reentered the residence. The prosecution theorized that defendant then shot Mr. Davies a

second time and removed the handcuffs and ropes binding both victims. When defendant returned to the car, he told Masse that Mr. Davies was still alive and was asking for help.

In the days following the robbery, defendant shaved off his mustache and, with his wife, fled the area. (He was arrested a year later in Port Aransas, Texas.) The authorities soon learned the robbers' identities. They persuaded Masse that if he was not the triggerman it would behoove him to turn himself in, which he did about a week after the shooting.

The prosecution case against defendant was overwhelmingly predicated on Masse's testimony. It was Masse who supplied the details of the planning of the robbery and his and defendant's respective roles during its execution. Masse's testimony was damning: he testified that he was alarmed when he heard or saw defendant shoot Mr. and Mrs. Davies, and that defendant, observing his state of shock, said: "Why should you get upset about these people? . . . You killed animals before, and you don't feel bad about them, and these people aren't no different than animals." Masse also testified that defendant wanted to shoot Killian, who was demanding her share of the proceeds. And according to Masse, shortly after the robbery defendant told him that if Mrs. Davies survived he would "take care of her," meaning shoot her. Masse testified that he felt threatened because he was the only one who could identify defendant as the triggerman. Masse stated that defendant told him, "Crime partners can't testify against each other . . . . If you do . . . you won't live very long." Masse turned himself in because "I didn't kill anybody, and I just thought it was the right thing to do."

Other significant testimony came from Mrs. Davies. She testified about the robber's entry into the home and his securing her and Mr. Davies. She did not know who shot her, but at pretrial lineups and in court she identified defendant as the man who came to the door, pointed a gun at her and Mr. Davies, and tied them up. Her identification of defendant in an initial photographic lineup was uncertain.

### 3. *Defense Case.*

To counter the prosecution's theory, the defense introduced evidence to try to undermine the reliability of Mrs. Davies's identification of defendant. But the defense's most significant effort in this regard was to impeach the testimony of Masse. Defendant introduced evidence that Masse was initially sentenced to life imprisonment without possibility of parole in the Davies case and that the district attorney had persuaded the sentencing judge to recall Masse's very severe sentence in exchange for Masse's testimony

against defendant. Masse was awaiting resentencing when he testified and, in exchange for his testimony, wanted to serve no more than 12 years' imprisonment.

In addition, defendant testified on his own behalf and, by necessary implication, identified Masse as the triggerman. He essentially corroborated Masse's account of events until the execution of the robbery—though he denied having shown Masse any utility equipment in the restaurant parking lot some days before. Rather, he stole a telephone company truck, apparently the day before the robbery. The truck contained utility paraphernalia. The next day Masse and defendant drove to the Davies residence but did not try to enter because it appeared no one was home. They drove to Robert DeSantis's house, where defendant retrieved his three-and-one-half-inch-long .22-caliber revolver. The gun had both lead- and copper-colored bullets. Defendant lent the gun to Masse. They returned to the Davieses' house, with Masse behind the wheel. Masse got out, wearing the purloined utility equipment, and went to the front door; Mrs. Davies admitted him. To avoid the scrutiny of the neighbor across the street, defendant tilted his head down while in the truck.

After a few minutes' waiting in the truck, defendant drove to another street, got into an Oldsmobile belonging to Masse's father, and alternately drove the car around and waited outside the Davies residence. Later he exchanged that car for his wife's Datsun and drove back. He saw that the Peugeot was still in the driveway. Finally, three or four hours after Masse first went in, defendant drove by and saw that the Peugeot was gone. Defendant then drove back to Robert DeSantis's house and saw Masse beginning to remove a carload of suitcases and a garment bag out of the Peugeot. Defendant helped Masse complete the task. Masse and Robert DeSantis left to dispose of the Peugeot; defendant stayed behind and opened some of the suitcases, which he saw contained various valuables. Masse returned about a half-hour later and defendant asked why it had taken Masse so long to complete the robbery. Masse seemed very distraught and said repeatedly, "I didn't mean to hurt them old people." (Linda DeSantis, Robert's wife, testified that she also heard the essence of Masse's lament.) Defendant examined his gun and noticed at least two bullets were missing. Masse told defendant he had left handcuffs on the victims at the residence and thrown away the keys. Masse and defendant both wanted to retrieve the handcuffs and, because Masse said he had bought the sets used in the robbery at a downtown Sacramento store, the two drove to that store to buy another pair with compatible keys. Defendant went in and bought the new set, even though Masse, according to defendant, owned the sets used to bind the Davieses and did not tell defendant what type of replacement to buy.

Masse was too upset to reenter the house, so defendant entered through a window he broke. He found the Davieses, both bloody and apparently dead,

lying on the kitchen floor. He removed the couple's handcuffs and cut the cords binding them. He decided to leave the state implicitly in part because Masse told the robbery's promoters that he had not committed the crime and did not know whether defendant had.

On cross-examination, defendant admitted he had shaved his mustache the night after the robbery even though he had no reason to believe the Davieses had seen him.

### B. *Penalty Phase.*

The first penalty jury deadlocked and a new panel was convened to try defendant's penalty case. The following evidence was introduced at the second penalty trial:

#### 1. *Prosecution Case.*

In aggravation, the prosecution introduced evidence of defendant's five prior felony convictions and evidence of prior unadjudicated criminal activity, including four other robberies and defendant's commission of sodomy against another jail inmate in 1984 while awaiting trial.

#### 2. *Defense Case.*

As at the guilt phase, defendant tried to establish the dubiousness of the case against him. He did not testify, but challenged the reliability of Mrs. Davies's identification of him, and called Masse as a witness in an attempt to impeach Masse's account of events and to illuminate for the jury the bargain Masse had struck with the authorities. Defendant also introduced evidence of his background and character, including the circumstances of his childhood and the quietude of his life in Port Aransas after his flight to Texas.

## II. JURY SELECTION ISSUES

### A. *Denial of Motion for Extra Juror Compensation.*

 Twice before the taking of evidence began in the guilt phase defendant requested that jurors who stated jury service would harm them financially be paid a daily amount that would reflect the minimum standard of living in Sacramento County—a term defendant did not define—rather than the $5 daily fee authorized by former section 1143. He argued that any other course of action ran the risk of making the jury unrepresentative, in violation of the federal due process clause as applied to the states. The court denied the motion, and defendant contends it erred thereby.

We have repeatedly rejected the claim. ■ "In order to establish underrepresentation, and thus denial of an impartial jury drawn from a fair cross-section of the community, a defendant must make a prima facie showing: '(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 587, 99 S.Ct. 664].)" (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1077 [255 Cal.Rptr. 352, 767 P.2d 619].)

■ At least five jurors were excused for financial reasons. Venireperson L. was being transferred to the Bay Area and could lose her job if required to stay. Venireperson C. was a single mother of two whose employer would not pay her while on jury duty. Venireperson D. was a dentist who could not afford to close his practice for five months. Venireperson F., an accounting clerk, was the main source of support for her three children because her husband earned $115.50 per week. And venireperson B.'s employer would pay him for only two weeks; he was the sole source of support for his girlfriend and their seventeen-day-old child.

Our independent review of the record discloses that the foregoing group was remarkably diverse with regard to race, ethnicity, sex, wealth, and income. The only factor common to the excused venirepersons was the financial difficulty that participating in a protracted trial would cause. That is not enough of a common interest to form a cognizable excluded class. (Cf. *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1214 [255 Cal.Rptr. 569, 767 P.2d 1047] ["Even assuming that only poor persons were given hardship exclusions, a fact not proven here, persons with low incomes do not constitute a cognizable class. [Citations.]"].) We need not revisit our statement in *Johnson* because the record does not reveal that the excused jurors were uniformly or even largely poor. Accordingly, defendant's claim fails to persuade.

B. *Exclusion of Ex-felons.*

■ Defendant also renews a contention that he asserts he raised in a pretrial motion to quash the venire: that the exclusion of ex-felons violated a Sixth Amendment right to a representative jury. We reject the claim on procedural grounds. Defendant does not accurately describe the record, for our own review reveals that the point was never litigated below. Rather,

defendant argued that the court should include resident noncitizens in the venire—a contention he specifically declines to renew on appeal.[2]

### C. *Restriction on Voir Dire at Second Penalty Trial.*

■ Defendant contends that in two instances the court improperly restricted his ability, in the initial sequestered questioning of potential jurors at the second and determinative penalty trial, to explore the specific crimes that would cause the venireperson to automatically vote for death. He maintains the ruling violated his rights under state law and the federal Constitution.

We recently decided this issue against a defendant in circumstances logically similar to those before us today. In *People* v. *Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127], the defendant sought to inquire about whether prospective jurors' attitudes toward evidence of the infliction of serious burn injuries might result in a vote for death. In rejecting Clark's contention that he was entitled to pursue his questioning in this area during the initial sequestered examination, we noted that *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301], requires, in a capital case, a sequestered examination of prospective jurors to learn whether conscientious or religious scruples would prevent the performance of their duties. But while it "is true that counsel must be permitted to ask questions of prospective jurors that might lead to challenges for cause [citation,] [t]he inquiry that defendant sought to make was not relevant to the death qualification process . . . . The *Witherspoon-Witt* (*Wainwright* v. *Witt* [(1985)] 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract, to determine if any, because of opposition to the death penalty, would 'vote against the death penalty without regard to the evidence produced at trial.' [Citation.] . . . There was no error in ruling that questions related to the jurors' attitudes toward evidence that was to be introduced in this trial could not be asked during the sequestered *Witherspoon-Witt* voir dire." (*People* v. *Clark, supra*, 50 Cal.3d at pp. 596-597, fn. omitted.)

Nor was there error here. Defendant does not contend, nor can he, that he was unable to learn whether the venirepersons were inclined, in the abstract, to impose the death penalty automatically, as he was constitutionally entitled to do (*Morgan* v. *Illinois* (1992) 504 U.S. __, __ [119 L.Ed.2d 492, 112 S.Ct. 2222]), for the record is to the contrary. Venireperson P. stated twice that she

---

[2]In any event, the point is without merit. (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 101-105 [154 Cal.Rptr. 734, 593 P.2d 595]; see also *People* v. *Karis* (1988) 46 Cal.3d 612, 633-634[250 Cal.Rptr. 659, 758 P.2d 1189].)

would not automatically vote for death for murder. The court curtailed voir dire only when defendant asked her what type of murder case warranted the death penalty. At that point the prosecution objected, and defendant rephrased his question to verify that venireperson P. did not believe that all murder cases should result in death. Defendant excused the venireperson peremptorily after his motion to excuse her for cause was denied.

Venireperson S., who unlike venireperson P. became a juror, also stated quite articulately that he favored the death penalty but would not automatically impose it because "I believe in mitigating circumstances and things like that" and would base his decision on "what the mitigation is and the aggravation." Defendant was thus able to learn in both instances the venireperson's attitude toward the death penalty in the abstract; and thus he could ascertain whether the venireperson was fit to serve on the jury.

Because we conclude there was no violation of state law or the federal Constitution in curtailing voir dire at this phase, we do not reach the People's contention that defendant in any event had failed to exhaust his peremptory challenges. We also leave aside defendant's argument that the People's contention misses the point because the court's rulings gave defendant notice that further questioning on the issue would not be permitted, and thus impinged on his ability to voir dire the entire venire.

### III. GUILT PHASE ISSUES

#### A. *Testimony of Gary Masse.*

In a separate proceeding before defendant's trial, Masse was sentenced to life in prison without the possibility of parole for his part in the crimes against the Davieses. While awaiting transfer to state prison, he contacted sheriff's officers, saying he wanted to give a complete account of his and defendant's role in the Davies crimes, and hoped his sentence could be reduced. The officers agreed to intercede with the district attorney's office, which in turn persuaded Masse's trial judge to recall his sentence pending the outcome of defendant's trial. After the officers took a tape-recorded statement from Masse, they told him that if he wanted to receive any benefit from the statement it would have to be true and verifiable and he would have to testify against defendant.

Defendant moved to exclude Masse's testimony until the latter was resentenced, and the court held a lengthy *in limine* hearing on the matter before denying the motion. The court found that three reasons had motivated Masse to give his statement: an expectation of a lesser sentence if the sentencing

court agreed; placement in a safe institution where he could pursue an education; and a desire, in the court's words, to "get a very sorrowful act off of his chest and, so to speak, wash and cleanse his soul." Masse testified against defendant, and thereafter was resentenced.

### 1. *Alleged Violation of Due Process.*

■ Defendant contends the court erred on due process grounds in allowing Masse to testify because the possibility of a greatly reduced sentence gave Masse a powerful inducement to perjure himself, and because the agreement Masse reached with the interviewing sheriff's officers impermissibly required Masse to testify against defendant in conformity with the tape-recorded statement he gave the officers. We disagree.

We recently reviewed the subject of accomplice testimony in *People* v. *Morris* (1991) 53 Cal.3d 152 [279 Cal.Rptr. 720, 807 P.2d 949]. We held that when an accomplice is granted immunity on condition that his or her testimony substantially conform to an earlier statement given to police, the testimony is tainted beyond redemption and its admission denies the defendant a fair trial. "On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid. [Citations.]" (*Id.* at p. 191.)

Notwithstanding defendant's efforts to portray the agreement as impermissibly tainted because Masse asserted that he expected to have to testify in conformity with his prior statement, the record elsewhere establishes that Masse meant by his assertion that his testimony at trial would have to conform to that given in his tape-recorded statement because both were true. Masse declared repeatedly that his duty under the agreement was to be truthful and give a complete account of the facts, and that if he did so the sentencing court might reduce his sentence. That was also his interviewers' understanding. Moreover, the record reveals that Masse expected the finding of his special circumstance to be overturned on appeal, leaving him with perhaps 17 years' actual time in prison. Masse's expectation of a lesser sentence was a hope that his time would be reduced to 12 years in an institution in which he would not be marked as a prosecution witness and hence be kept in protective custody. Finally, the voluminous record of the hearing on this issue supports the finding that Masse felt remorse for his part in the Davies crimes and wished to give a true account of his role. In sum, though the bargain obviously contained "a . . . degree of compulsion [of the type] inherent in any plea agreement or grant of immunity" (*People* v. *Morris, supra,* 53 Cal.3d 152, 191), from Masse's perspective the degree of

compulsion was not overwhelming, and more important, the only demand Masse understood the agreement made of him was to tell the truth. Such a bargain did not make the trial fundamentally unfair, and hence did not offend defendant's due process rights.[3]

■ Next, defendant contends his due process rights were violated even if the agreement required only that Masse's testimony conform with the truth, because Masse in fact believed he was required to testify according to a predetermined formula. The record belies this contention. Questioned again and again about his understanding of the nature of the testimony he was to give, Masse continued to emphasize his understanding that he was to tell only the truth.

We also find of paramount significance the fact that the jury was aware of the bargain: Masse was extensively and effectively examined by defendant's counsel on his expectations of a reduced sentence following his testimony. The jury had every opportunity to discount or entirely disbelieve Masse's testimony—an opportunity enhanced by the court's instructions that Masse was an accomplice as a matter of law and that an accomplice's testimony is to be distrusted. The jury chose to believe Masse and not defendant despite the examination and instructions.[4]

---

[3]Defendant also contends that even if the agreement turned on the trial court's determination of the truth of Masse's testimony, it violated due process because the sentencing court had heard the evidence presented at Masse's trial and that court's determination of the truth was therefore dependent on the congruence between Masse's story and what the court had already heard. But defendant offers no reference to the record that might buttress his ultimate contention that the agreement therefore required Masse to testify in conformity with a predetermined formula, and we reject it as speculative. Similarly speculative is defendant's claim, emphasized at oral argument, that Masse had already heard the prosecution's theories at his own trial, therefore knew what the prosecution wished to hear at defendant's trial, and tailored his testimony to conform to what he knew the prosecution would want to hear.

[4]Defendant also relies on *Franklin* v. *State* (1978) 94 Nev. 220 [577 P.2d 860, 861], in which "Under threat of a death sentence, [an accomplice] ultimately recited a version of events satisfactory to the prosecution, agreeing to testify against [the defendant]." The nature of the bargain struck in *Franklin* is unclear. It appears, however, that the state had planned to charge the accomplice with a capital offense but agreed to prosecute him only for second degree murder if after the defendant's trial his testimony proved to be satisfactory. (*Id.* at pp. 860-861.)

Relying on California cases antecedent to *People* v. *Morris, supra,* 53 Cal.3d 152, *Franklin* stated that the application of the rule regarding accomplice testimony "may not be limited solely to situations where immunity is expressly conditioned on specific testimony. As a matter of logic, if the circumstances of the plea bargain would reasonably cause the alleged accomplice to believe he must testify in a particular fashion, then a less explicit arrangement also violates the defendant's due process rights. . . . [¶] The prosecution did not permit [the accomplice] to plead guilty until *after* his testimony was given at the . . . trial. . . . Obviously, such tactics must be extremely effective to elicit testimony the prosecutor desires." (*Franklin* v. *State, supra,* 577 P.2d at pp. 862-863, fn. omitted.)

## 2. *Other Constitutional Considerations.*

■ Defendant contends the agreement violated his Federal Eighth Amendment right as a capital defendant to heightened scrutiny in the fact-finding process. He relies on *Franklin* v. *State, supra,* 577 P.2d 860, 863, in which the prosecution became "committed to a theory quite possibly inconsistent with the truth and the search for truth." For the reasons described above, we do not believe the prospect of obtaining Masse's testimony committed the prosecution to a theory suffering from such a deficiency, and therefore reject the claim.

Defendant also contends that he was denied an opportunity for effective cross-examination under the Sixth Amendment because Masse was locked into a recitation of the prosecution's version of the facts as he had learned them at his own trial. We need not consider the validity of the constitutional premise that grounds this contention because we have concluded, after a thorough review of the record, that Masse was not confined in the manner that defendant suggests.

## B. *Victim's Identification of Defendant.*

Mrs. Davies identified defendant at trial as the man who came to the door and began the robbery that culminated in her husband's murder. Defendant moved to exclude Mrs. Davies's in-court identification because the photographic and physical lineups she saw were impermissibly suggestive and gave rise to a likelihood of misidentification. Defendant also filed a "trial motion to exclude Grace Davies' identification" on the ground that defense counsel had been barred from questioning her immediately following her identification of defendant at a physical lineup. In a written ruling, the court granted the motion to exclude evidence of the physical lineup identification because defense counsel was ordered from the room immediately following the lineup, but denied the motion to exclude the in-court identification, finding that defendant had failed to meet his burden of establishing unduly suggestive and unnecessary lineup procedures.

■ Defendant contends the in-court identification should have been excluded because both prior lineups were suggestive, and tainted the in-court identification. We find his contention unpersuasive.

---

We find *Franklin* inapposite. First, though it is unclear what bargain was struck in that case, the court stated that the prosecution "bargain[ed] for specific testimony to implicate a defendant . . . ." (*Franklin* v. State, *supra,* 577 P.2d at p. 863.) Second, there was no independent inculpatory evidence against the defendant whatever, and the court was concerned that justice would not be served when the prosecution coerced testimony to achieve an end that could not be achieved with trustworthy evidence. (*Id.* at pp. 861, 863, 864.)

■ Defendant bears the burden of showing unfairness as a demonstrable reality, not just speculation. (*People* v. *Perkins* (1986) 184 Cal.App.3d 583, 589 [229 Cal.Rptr. 219].) "The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary (*Manson* v. *Brathwaite* [(1977)] 432 U.S. [98,] 104-107 . . . ; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation (*id.* at pp. 109-114 . . .). If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable. (*Id.* at pp. 104-107, 109-114 . . . .) [¶] . . . It is unsettled whether suggestiveness is a question of fact (or a predominantly factual mixed question) and, as such, subject to deferential review on appeal, or a question of law (or a predominantly legal mixed question) and, as such, subject to review de novo. [Citations.]" (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1242-1243 [270 Cal.Rptr. 451, 792 P.2d 251].) ■ Even under independent review (see *id.* at p. 1243) we hold that the court's determination was sound; its reasoning, set forth in clear detail in the record and recapitulated as necessary below, is persuasive.

### 1. *Photographic Lineup.*

Mrs. Davies remembered the man who came to the door as sporting a red jacket. Defendant contended that the five-man photographic lineup was too suggestive because only his photograph featured a dark background, and only he wore a red shirt. He renews this contention on appeal.

The trial court found that "The fact that the photo . . . showed him wearing a red colored shirt or jacket . . . did not cause the defendant to be 'singularly marked for identification.' *People* v. *Caruso* (1968) 68 Cal.2d 183, 187 [65 Cal.Rptr. 336, 436 P.2d 336]."

We agree. Our own inspection of the lineup photographs shows defendant to have worn a rather soiled open-necked red or orange golf-type shirt. This hardly uncommon apparel cannot be termed a badge of identity here, particularly because it bears no resemblance to a jacket at all. The trial court also explained, "Witness Davies testified she made her selection looking at the defendant's hair and face; she did not notice the shirt. Further, the photo lineup was not shown to the witness immediately after the commission of the crime, vitiating any suggestion that the photo might have been taken on or about the date the crime was committed."

In sum, we agree with the trial court that the mere wearing of an item of apparel of the same color as that recalled by the witness—particularly a different item of apparel, for defendant does not dispute that the man who came to the door wore a jacket whereas the photograph showed defendant in a shirt—does not, without more, make the lineup unduly suggestive. Defendant has cited no authority to the contrary, and we find his contention merely speculative.[5]

### 2. *Physical Lineup.*

Next, defendant contends, as he did before the trial court, that the physical lineup was unnecessarily suggestive because, to mask defendant's stature, he was made to stand on books that were concealed from the viewer and his apparent height was thereby increased.[6] We do not agree.

Mrs. Davies described the person who came to her door as slightly taller than her husband, whose height was estimated at five feet eight or nine inches. The lineup featured four stand-ins whose respective heights, defendant states, were five feet seven inches, five feet nine inches, five feet ten inches, and five feet ten inches. Whether defendant is five feet four inches or five feet six inches, our own examination of the lineup photograph reveals no undue suggestiveness in the procedure and we decline to find error in admitting the identification.

First, there were no markings on the wall that might have provided Mrs. Davies a clue about the participants' actual heights. (Cf. *United States* v. *Sanders* (8th Cir. 1980) 626 F.2d 1388, 1389 [even when markings were provided, lineup was not unduly suggestive].) Second, Mrs. Davies testified she thought defendant's height was about right because he was one of the two shortest men in the lineup. Indeed, had the police failed to elevate defendant to equalize the heights of the lineup participants, he might well have challenged the discrepancy in his height. (See *United States* v. *Lewis* (8th Cir. 1976) 547 F.2d 1030, 1035.) Finally, defendant does not contend that the stand-ins had significantly different facial or hair characteristics from his own (cf. *ibid.*)—a contention he could not make, for our review reveals no such distinctions—and Mrs. Davies was told defendant might not

---

[5]For this reason, we need not address the People's contention that even if the photograph was suggestive the identification was otherwise reliable.

[6]Defendant states that his height is five feet four inches; the trial court found his height to be five feet six inches, and there was evidence that his height is five feet five and one-half inches. As will appear, we find these differences immaterial.

be in the lineup at all. Under these circumstances we cannot find undue suggestiveness in the lineup procedure.[7]

Because we find no undue suggestiveness in the photographic lineup, we cannot agree with defendant that that procedure tainted the physical lineup. The fact that defendant was the only person common to both lineups did not per se violate his due process rights. (*United States* v. *Cook* (9th Cir. 1979) 608 F.2d 1175, 1178-1179 [54 A.L.R. Fed 661]; *People* v. *Hernandez* (1970) 11 Cal.App.3d 481, 488 [89 Cal.Rptr. 766] [dictum].)[8] Furthermore, we note that defendant's appearance in the physical lineup differed from that in the photographic lineup—in the latter he was unshaven, in the former clean-shaven.

## C. *Removing Element of Burglary From Jury's Consideration.*

■ Defendant contends the court directed a verdict on an element of the burglary with which he was charged. He contends that the court's action constituted error of constitutional magnitude that requires reversal of the burglary conviction, vacation of the finding of the burglary special circumstance, and reversal of the judgment of death. We do not agree.

■ To be sure, a defendant enjoys a federal due process right to have the state prove beyond a reasonable doubt every fact necessary to constitute the crime charged. (E.g., *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 523 [61 L.Ed.2d 39, 50-51, 99 S.Ct. 2450].) The court thus erred if it gave an instruction that removed a core element of the crime from the jury's consideration. ■ But it did not do so here.

The court instructed the jury according to former CALJIC No. 14.50. The court stated, as relevant here, "Defendant is charged . . . with . . . burglary, a violation of section 459 of the Penal Code. [¶] Every person who enters any structure of a type shown by the evidence in this case with the specific intent to steal, take, and carry away the personal property of another of any

---

[7]We note in passing that differences in height during a lineup may be neutralized by having all participants sit. (See *Com.* v. *Bey* (1977) 249 Pa. Super. 185 [375 A.2d 1304, 1307 & fn. 7] [participants sat behind table to eliminate height differences].)

[8]Our holding that the lineups were not suggestive makes it unnecessary to decide whether the in-court identification was reliable despite the suggestiveness. Defendant contends there is "also another reason for suppressing the physical lineup," i.e., the fact that defense counsel had been barred from questioning the witness immediately following her identification at the physical lineup. As noted, the trial court excluded evidence of the physical lineup because of this fact. To the extent defendant argues that this exclusion alone rendered the in-court identification inadmissible, regardless of any suggestiveness in the lineups, he does not support the claim with adequate argument. We therefore reject the point as not properly raised. (*People* v. *Gordon, supra*, 50 Cal.3d 1223, 1244, fn. 3.)

value, and with the further specific intent to deprive the owner permanently of such property, is guilty of . . . burglary. . . . [¶] In order to prove . . . burglary, each of the following elements must be proved: One, that a person entered a structure of the type shown by the evidence, [and] two, that at the time of the entry, such person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of such property."

Section 459 provided in pertinent part at the time of the crimes charged that anyone who enters "any house [or numerous other fixed structures or parts thereof] or other building [or numerous other places] with intent to commit grand or petit larceny or any felony is guilty of burglary."

The instruction required the jury to find that defendant entered a structure. It also required the jury to find that defendant entered a structure of the type shown by the evidence. The only thing that the instruction did not require of the jury was a finding that the "structure of a type shown by the evidence" was a building. But only one type of structure was shown by the evidence: the Davieses' house. By definition the house was a building. No rational trier of fact could have found that the structure shown by the evidence—the Davieses' house—was not a building. The law does not require the jury to decide the impossible. There was no error.[9]

## D. *Restriction on Masse Cross-examination.*

### 1. *Impeachment With "Perjury" Incident.*

During the pretrial hearing into the propriety of the bargain Masse had struck with the prosecution, Masse mentioned that in 1973 he agreed to testify against one Ashton in a criminal proceeding after Masse was arrested. According to Masse, the district attorney prosecuting the case against Ashton told Masse to leave out certain portions of his story while testifying. Masse did so at first but then, on cross-examination, refused to continue and volunteered to the court that his testimony had not been the whole truth.

The prosecution filed a motion *in limine* seeking to bar defendant from referring to this incident for purposes of impeachment. Over defendant's

---

[9]In any event, defendant admitted that the dwelling entered by the man who accosted the Davieses was a house and that the entrant was a burglar. His counsel conceded during the parties' review of possible instructions that "the evidence is uncontroverted this was a burglary of a home during the daytime." Thus had any federal constitutional error occurred, it would have been harmless. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The same conclusion applies to defendant's contention that the instructions allowed the jury to convict him of burglary if he either entered the structure or intended to steal.

opposition the court granted the motion, ruling that the incident was a collateral matter and substantially more prejudicial than probative (Evid. Code, § 352), was remote in time, and was barred by Evidence Code section 1101, subdivision (b) (barring, as then worded, introduction of other acts to show "disposition to commit such acts"). A similar prosecution motion during the second penalty phase was also granted.

Defendant characterizes Masse's prior testimony as the Ashton "perjury incident," and contends the court erred on all three stated grounds in barring the testimony. In addition, defendant contends that the rulings violated his Sixth Amendment confrontation and Fifth and Fourteenth Amendment due process rights, and the Eighth Amendment.

We need not consider whether the court erred in ruling that the event was too remote in time or that section 1101 of the Evidence Code barred its admission, because we conclude that the ruling that the evidence was substantially more prejudicial than probative must be sustained.

It is axiomatic that a court has wide discretion to exclude evidence as substantially more prejudicial than probative. Its ruling therefore will be sustained on review unless it falls outside the bounds of reason. (*Shamblin* v. *Brittain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339].) In this case the record reveals ample reason to exclude the evidence.

First, defendant was given considerable leeway to introduce evidence suggesting Masse's strong current motivation to lie. Thus the ruling arguably could be sustained on the ground that the evidence was cumulative.

Even more compelling, however, is the fact that the evidence's probative value was minimal. Had Masse indeed committed perjury in the Ashton proceeding, the evidence of that misdeed might have significantly buttressed defendant's case. But our reading of the record leads us to conclude that defendant's characterization of Masse's testimony in the Ashton case is flawed. The record most strongly suggests that Masse—who appears to be an unsophisticated and artless individual—was told by the prosecution before the prior proceeding to avoid certain areas of testimony and focus on others.[10] Masse tried to follow directions but during cross-examination concluded he was not telling the whole truth and volunteered to the Ashton court that he was lying. Under defense counsel's persistent questioning in this case, Masse stated that he had committed perjury; but a lay witness's conclusion about the legal effect of his own actions is incompetent, and like

---

[10]The record permits us to draw no conclusion whether the prosecution in that case had an improper motive for telling Masse to concentrate on certain aspects of his observations.

the trial court we are unpersuaded that defendant showed Masse committed perjury in the first place. Indeed, the evidence was susceptible of an interpretation that Masse had a tendency to prefer the truth over instructions from authority figures to testify selectively; thus, particularly in this case, the introduction of that evidence might well have enhanced Masse's credibility.

In sum, the evidence that the prosecution wished to bar was of questionable value and paled in significance beside the evidence the jury was allowed to hear—evidence that in exchange for his testimony Masse stood to avoid the possibility of additional decades in prison. We discern no abuse of discretion in the ruling, and for the foregoing reasons we also discern no violation of defendant's federal constitutional rights.[11]

### 2. *Masse's Reference to Cognitive Difficulties.*

At trial the court asked defendant if he wished to introduce a statement the court "attributed" to Masse: that Masse had trouble remembering things "because of his brain cells." After defendant said he did wish to introduce the statement, the court ruled against its admission because a layperson is incompetent to give a clinical medical diagnosis of his or her physical condition. The court did rule, however, over the prosecution's objection, that defendant would be allowed to introduce expert testimony on Masse's cognitive shortcomings and to cross-examine Masse on that point. Defendant contends the court erred in suppressing Masse's statement that he had trouble remembering "because of his brain cells."

For procedural reasons alone we could reject this contention. The page of the record defendant cites as containing Masse's statement contains no such language, and the trial court itself stated only that such a statement had been attributed to Masse, not that Masse had made it. We are not required to scrutinize the voluminous record to locate the statement, if any, that Masse

---

[11]Not only is Masse's understanding of the elements of perjury questionable, but his command of plain English also was sufficiently poor that he had trouble distinguishing between lack of truthfulness and simple inability to recall. On Masse's direct examination, the following exchange occurred:

"Q. Were handcuffs used to bind Mr. and Mrs. Davies?
"A. Yes, they were.
". . . . . . . . . . . . . . . . .
"Q. How were they bound?
"A. They were—they had handcuffs behind their back.
"Q. Uh-huh.
"A. And I can't be truthful about the feet.
"Q. What do you mean by you can't be truthful about the—
"A. You know, what they had on their feet.
"Q. Uh-huh. Do you know if they were bound with rope at all?
"A. I can't even, you know—I don't know. I can't remember the feet part."

made. We will, however, give defendant the benefit of the doubt that Masse made such a statement. We conclude that the court erred in excluding it. Assuming that the proffered testimony related to Masse's present cognitive difficulties, it was admissible opinion evidence (Evid. Code, § 800), for "there is no logical reason why qualified lay witnesses cannot give an opinion as to mental condition less than sanity" (*People* v. *Webb* (1956) 143 Cal.App.2d 402, 412 [300 P.2d 130]) or to similar cognitive difficulties.

Defendant wished to introduce the statement to show that Masse recognized his memory was impaired. But our reading of the relevant record shows that the jury was made fully aware of the shortcomings in Masse's memory in two other ways. Thus we conclude the error was harmless.

First, defendant was allowed to present a psychiatrist's expert testimony that Masse suffered from a borderline personality disorder that affected his memory and perception, a disorder that is the second-worst personality disorder in the psychiatric compendium. The jury heard that Masse had been diagnosed as psychotic, meaning that he had trouble perceiving reality correctly. The jury also heard that Masse had been hospitalized 13 times—a frequency that placed him in the top 5 percent of psychiatric patients—for a total of 132 days. The defense psychiatrist observed that Masse had an unusually poor memory. He mentioned a 1979 report that Masse had "repressive defenses," a condition permitting an individual to obliterate an event from memory. In sum, defendant was able to present strong evidence of poor memory and other cognitive defects.[12]

Second, we note that Masse stated over and over that he could not recall various events. If the jury would not have been influenced by Masse's repeated direct statements of his inability to recall when questions were put to him, it could not possibly have been influenced by a hearsay statement suggesting that Masse's ability to recall was impaired. Thus, the evidence would have been of little value. (Evid. Code, § 352.) For the foregoing reasons, we decline to find prejudice under state or federal law.

E. *Admission of Masse's Statement to Authorities Implicating Defendant.*

After Masse testified, the prosecution called Lieutenant Biondi, whom Masse had telephoned while still a fugitive. Masse had called Biondi at least

---

[12]Masse's mental state was effectively attacked in other ways. The jury heard that Masse had attempted suicide, had been under psychiatric care from 1975 to 1981, and had had electroshock therapy. Moreover, Masse himself provided effective evidence of his deficiencies. Often monosyllabic, inaudible, or inarticulate, Masse was a far cry from the ideal witness. If the jury chose to believe Masse, it must have relied on a quality of his testimony other than the mental acuity it revealed.

in part to discuss the desirability of surrendering himself to the authorities. Biondi testified that Masse told him, "We just went in there to do a robbery. I didn't know he was going to shoot the old people." Defendant objected on the ground of hearsay, and he contends the court erred in admitting the statement as a prior consistent statement because, contrary to the terms of the relevant statute, Masse's motive to fabricate his declaration arose before he made it.[13] ■ In defendant's view, the record establishes that Masse's motive to fabricate arose at the time of the murder, when he realized he could bear the entire penal consequences of the incident. The People respond, as they did at trial, that the statement was admissible as a prior consistent statement; in addition, they contend the statement was admissible as a prior inconsistent statement.

We agree that the statement was properly admitted as a prior consistent statement. Thus, against defendant's urgings, we conclude that *People* v. *Andrews* (1989) 49 Cal.3d 200 [260 Cal.Rptr. 583, 776 P.2d 285] governs in light of the record here. In *Andrews*, an analogue to this case, the defense examination of an accomplice turned prosecution witness implied that a plea bargain that the accomplice had accepted provided an additional motive to testify untruthfully. "This, in turn, entitled the prosecution to show that [the accomplice's] testimony was consistent with the [apparently hearsay] recorded statement he gave shortly after his arrest but before the 'deal' was consummated, that is, before the subsequent, specific motive to fabricate arose. [Citations.]" (*Id.* at p. 210.)

In our view *Andrews, supra,* 49 Cal.3d 200, applies fully to this case. Defendant extensively cross-examined Masse about the deal he had made with the authorities to have his sentence recalled in exchange for his testimony. Whatever motive Masse may have had to place the blame on others for the events in the Davieses' house at the time he spoke to Lieutenant Biondi on the phone, defendant implied that the possible modification of Masse's sentence yielded a compelling additional incentive to lie, an implication that in turn entitled the prosecution to rehabilitate Masse with his prior consistent statement.

Defendant also contends that his federal constitutional right to due process of law was violated when Masse's hearsay statement was admitted. He cites *Hicks* v. *Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 180, 100

---

[13]Evidence Code section 791 provides in part, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

S.Ct. 2227], which states that when a state "has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law." We do not discern, however, how the language of *Hicks* aids defendant. Masse's statement was admissible to refute an implication that his testimony was tainted by his desire to win a reduced sentence. Because the statement fell within the statute's scope and the statute's constitutionality is unchallenged, we perceive no due process violation.

### F. *Admission of a Photograph of the Davieses.*

The prosecution showed three witnesses a photograph of the Davieses, apparently on vacation in Boulder City, Nevada, in 1981, for identification purposes. When the prosecution moved to introduce the photograph into evidence, defendant objected on grounds of relevance and undue prejudice, stating that the photograph would serve only to curry the jury's sympathy for the victims. Defendant offered to stipulate to the Davieses' identity. The court declined the offer and overruled the objection on the basis of the prosecution's prior use of the photograph for identification.

 Defendant contends admission of the photograph was error on both state evidentiary grounds. To be sure, we have repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items. (See *People* v. *Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 836 [1 Cal.Rptr.2d 696, 819 P.2d 436] [guilt phase]; *People* v. *Cox* (1991) 53 Cal.3d 618, 663-664 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 577-578 [77 L.Ed.2d 1171, 103 S.Ct. 3446], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446]; see also People v. *Anderson* (1990) 52 Cal.3d 453, 474-475 [276 Cal.Rptr. 356, 801 P.2d 1107].) Otherwise, there is a risk that the photograph will merely generate sympathy for the victims. Indeed, our own inspection of the photograph in issue here suggests that it possibly did generate sympathy for the victims, a harmless- and congenial-appearing elderly couple.

Nonetheless, we decline to find error. The photograph, which was shown to three witnesses, was relevant to establish the witnesses' ability to identify the victims as the people about whom they were testifying. The possibility that it generated sympathy for the victims is not enough, by itself, to compel its exclusion if it was otherwise relevant. After all, Mrs. Davies's presence on the stand probably also generated sympathy for her and her late husband, but it would be unreasonable to demand that she testify behind a screen to lessen the impact of her presence on the jury.

Moreover, even if error occurred, it could not have been prejudicial. As we concluded in *People v. Kelly, supra,* 51 Cal.3d at pages 963-964, this was not a close case in which sympathy for the victims might have led the jury to improperly convict. It would not have been reasonably probable that the outcome would have been more favorable to defendant had the photograph been excluded. Its admission thus would not have warranted reversal on state-law grounds. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant also contends that admission of the photograph violated his federal constitutional rights. Citing *Beck v. Alabama* (1980) 447 U.S. 625, 632, 636 [65 L.Ed.2d 392, 399-400, 402, 100 S.Ct. 2382], he argues that the photograph's appeal to the jury's emotions infringed upon the Eighth Amendment's guaranties.

The authority defendant cites does not support that proposition. *Beck v. Alabama, supra,* 447 U.S. 625, held unconstitutional a penal scheme that prohibited giving lesser included offense instructions in a capital trial, thereby, as the petitioner in that case argued, "forcing the jury to choose between conviction on the capital offense and acquittal . . . ." (*Id.* at p. 632 [65 L.Ed.2d at pp. 399-400].) "Such a risk," the court concluded, "cannot be tolerated in a case in which the defendant's life is at stake. . . . [¶] 'It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.' " (*Id.* at pp. 637-638 [65 L.Ed.2d at pp. 402-403].) But the prohibition against "caprice or emotion" is qualified: to be invalid the procedural rule must tend to "diminish the reliability of the guilt determination." (*Id.* at p. 638 [65 L.Ed.2d at pp. 403].) We perceive no such diminution here despite our view that the photograph possibly did create sympathy for the victims. Given the strong evidence of defendant's guilt, the possibility is very slight that any impermissible sympathy it generated toward the victims in turn led to the verdict.

G. *Jailhouse Informant's Assertedly Improper Rebuttal Testimony.*

After Masse testified that he and defendant entered the Davieses' house and defendant shot the couple, defendant appeared as a witness on his own behalf. He testified that he never entered the house at all, but circled the neighborhood in various cars, maintaining a vigil on the house for several hours while Masse carried out the robbery and by inference shot the victims. He also testified there was no discussion between him and Masse about shooting the Davieses or killing them by any means.

In rebuttal the prosecution sought to call Robert Elliott, a trusty on defendant's floor in the Sacramento County jail and a jailhouse informant, to

testify that defendant told him he shot Mr. Davies. (On cross-examination Elliott would state that defendant also said he and Masse flipped a dime to determine who would shoot whom, and that Masse shot Mrs. Davies.) Defendant objected on grounds of improper rebuttal and that the evidence was substantially more prejudicial than probative. The defense argued that Elliott's information was obtained during an interview on February 25, 1985, while the prosecution was still presenting its case, so that Elliott could have been called to testify in the case-in-chief. The prosecution rested its principal case on March 7, 1985.

The prosecutor stated that he didn't know defendant was going to "tell the story he did until last week." The court agreed, stating that the prosecutor "may well have been satisfied, acting in good faith, that he had put the sufficient proof on to argue his position with the jury, until the point that Mr. DeSantis got up here and testified and came forward with his story . . . and strategically at that point, he may well have felt it would [benefit] the position of the People to bring [Elliott] on to say whatever he's going to say, if he can say it."

Defendant argued that "nothing could be clearer [i.e., more material to the prosecution's case-in-chief] than . . . a statement Mr. DeSantis was the person who shot Ed Davies . . . and . . . by allowing him now to offer this evidence in rebuttal, you are focusing, allowing the jury to put undue weight and focus on that evidence, and we would most respectfully submit that it would constitute an abuse of discretion." The prosecutor replied that "It's the kind of evidence that . . . takes a little time to check out. [¶] It's also—I was not aware what Mr. DeSantis' position was in this case."

The court ruled that because the evidence was discovered near the close of the prosecution's case and that it served the ends of justice to investigate the testimony before presenting it to the jury, the court would exercise discretion to allow its introduction in rebuttal.[14]

■ On appeal, defendant contends that the Elliott testimony constituted improper rebuttal. We must disagree.

The decision to admit rebuttal evidence over an objection of untimeliness rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 323 [777 P.2d 121].) " 'Although a crucial witness known and available to the prosecution should be called during the

---

[14]The court mistakenly stated that the testimony was discovered only two or three days before the prosecution rested its case.

case-in-chief (*People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665]), circumstances may make that order of proof impossible. The order of proof lies within the sound discretion of the trial court . . . .' " (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1184 [240 Cal.Rptr. 666, 743 P.2d 301].) Here, as in *Gates* and unlike in *Carter* (see *ibid.*), the prosecutor explained the delay in presenting Elliott's testimony. He stated that he needed to investigate the merits of the claim, which was made shortly before the People rested their case, and that he was surprised by defendant's testimony. The record supports the court's decision to accept the prosecution's explanation, and we discern no reason to disturb that ruling on appeal.

## IV. PENALTY PHASE ISSUES

### A. *Jury Conduct Issues.*

#### 1. *Allegation That Court Failed to Inquire Into Possibility Jurors Were Dozing.*

During the taking of evidence at the penalty phase, defense counsel asked to approach the bench for an unreported conference. Thereafter the court directed the jurors to stand up and stretch, and said, "If at any time somebody feels drowsy, let me know, and we'll call a short recess. [¶] Sometimes when we close our eyes, we can still think, but it's best if we keep them open." At the next recess, counsel said he had counted four jurors who "had their eyes closed and appeared to me [to be] dozing." Of Juror S. the court said, "There was no indication that Mr. [S.] was ever sleeping. It's just that he sits there with his eyes closed. . . . [He] sits there with his eyes closed, but he's not dozing because I can see that his head's not bobbing."[15] Of the four relevant jurors collectively, the court said it had not noticed them to be dozing, but that "their eyes are closed occasionally." Defense counsel did not pursue the matter until later in the penalty phase, when he complained that "During the testimony this morning, Mr. [J.], juror number nine, appeared to have dozed off." The court disagreed: "I was watching, and he was twiddling his thumbs while he had his eyes closed, so it was apparent—I was trying to mimic that, and you can't sleep and twiddle your thumbs at the same time." Defense counsel asked the court if it would like to be alerted if counsel observed other potential misconduct, and the court agreed, reiterating that "I was keeping a close eye on it, and I was ready to call a recess, except, as I say, he was twiddling his thumbs, and then he would open his eyes, so I figured he couldn't be sleeping and twiddling his thumbs at the same time . . . ." Defense counsel did not pursue the matter further, and never asked the court to voir dire the jury.

---

[15]We have omitted jurors' full last names when they appear in quotations.

■ Defendant contends the court erred in failing to act on these two occasions, thereby violating his rights under state law, the federal due process clause as applied to the states, the cruel and unusual punishments clause, and his right to a jury trial under the state and federal Constitutions. We disagree with the basic premise of these contentions—that the court failed to act—and therefore reject the claims.

In *People* v. *Adcox* (1988) 47 Cal.3d 207, 252-254 [253 Cal.Rptr. 55, 763 P.2d 906], we discussed an allegation that the trial court failed to voir dire the jury on its own initiative regarding the jurors' possible exposure to newspaper articles. Counsel moved for a mistrial but did not request that the jurors be questioned regarding such possible misconduct. We stated, "the better and proper course of action here would have been for the court 'to make whatever inquiry is reasonably necessary' to determine if there was in fact any misconduct, and if such be found, whether 'the [offending] juror should be discharged . . . .' " (*Id.* at p. 253.) We did not describe the form the inquiry must take, but implied that a hearing is required. (*Ibid.*)

We now conclude that the failure to conduct a formal hearing is not always error and was not error here. The record reveals that the court was constantly alert to the danger of jurors' dozing and observed the allegedly offending members closely. It found that none was dozing and made specific observations to that effect in the case of Jurors S. and J. Thus, as the Attorney General observed at oral argument, the court did undertake a self-directed inquiry, short of a formal hearing, that recognized the conflict between the need for a fair trial by 12 competent jurors and the undesirability of interrupting the proceedings whenever a question of juror inattention is raised. We believe the court's self-directed inquiry was adequate under the state and federal Constitutions and state law, and find no error.

2. *Allegation that Jurors Overheard Witness in Hall.*

Earlier in the penalty phase a defense investigator told the court, outside the jury's presence, that a witness had been talking loudly enough in the hallway during a recess for jurors to overhear him, and that he had told him to keep silent. The court directed the parties to keep their witnesses at a distance from the jury during recesses, and the matter ended there without any defense objection or even material interjection into the discussion. ■ Defendant now raises essentially the same contentions as set forth immediately above, contending that his state and federal constitutional rights and state statutory rights were violated when the court failed to inquire into the substance of the overheard remarks.

Inadequate separation between witnesses and jurors during recesses is a common enough hazard, and the court and parties are obliged to guard

against it. Nevertheless, there is nothing in the record to suggest that any material matter was overheard here. The defense did not regard the matter as serious enough to request a hearing or even to engage in a colloquy with the court regarding the matter; the investigator merely mentioned the item as an afterthought to another matter he raised regarding hallway conduct. Under these circumstances we find no error in the court's failure to hold a hearing.

**B.** *Issues Related to Lingering Doubt About Defendant's Role.*

As mentioned above, the jury that decided defendant's guilt could not decide his fate, and a second jury was impaneled for that purpose.

The jury that decided guilt convicted defendant of first degree murder and found true burglary and robbery special-circumstance allegations. It also made certain special findings: that defendant killed Edward Davies with premeditation and deliberation; that defendant personally killed Edward Davies; and that he intentionally killed Edward Davies. The prosecution introduced the verdicts and findings in evidence at the second penalty trial.

Defendant contends that the court committed error, that the prosecutor committed misconduct, or that both events occurred at several phases of his penalty retrial, thereby deterring the jury from entertaining any lingering doubt about his guilt or the circumstances of the crime. For reasons that will appear, we find his argument ultimately to be unpersuasive.

**1.** *Litigation of the Issue.*

**a.** *Voir Dire.*

During voir dire of the second penalty jury, the prosecutor asked the venire whether its members would "be able to limit yourself solely to the issue of deciding the appropriate penalty in this case, and not . . . attempt to try and relitigate all the facts [regarding guilt]. . . . [¶] In other words, can you accept the verdict of the 12 prior people on faith and proceed forward from there?" When defendant objected to the prosecutor's interpretation of the law, the court stated, "we are not going to relitigate the issue of guilt or innocence. . . . [¶] Your sole issue here is to determine . . . what the penalty will be." Later the prosecutor said to a venire of 36 potential jurors, "in this phase of our trial, we are simply determining what the penalty shall be. [¶] Is there any juror who feels that they would have difficulty in accepting the fact that Mr. DeSantis is guilty of first degree murder as decided by a previous jury? [¶] In other words, accepting basically on faith that he is guilty of murder?" When defendant objected that the prospective

jurors should be individually questioned on the matter, the court demurred and reaffirmed that "it will not be your function to [decide] whether or not he is guilty or not guilty. That has already been decided. [¶] Your sole function will be to determine whether or not the penalty should be death or life imprisonment without the possibility of parole."

In addition, the court, specifying that "the issue of guilt is not to be reconsidered by you," sustained an objection to a question by defense counsel whether a venireperson could follow an instruction that "you could consider the claim of innocence by Mr. DeSantis in terms of possible doubt about his complicity in the crime . . . ."

Finally, the prosecutor, reacting to a question put to venireperson W. about the possibility of executing an innocent person, asked her, "do you realize in this case you don't have to make a decision as to whether or not Stephen DeSantis committed a crime?" When venireperson W. answered yes, the prosecutor said, "So you don't have to be concerned beyond a reasonable doubt, beyond a shadow of a doubt, beyond an absolute doubt or whatever expression . . . [¶] you use when you come to weigh the decision as to whether or not he's to be put to death." Defendant objected to this exchange, but not on a ground relevant to his claim of error here: he contended that "the jury must be satisfied beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating." The prosecutor replied in part, "I'm not even talking about that."

b. *Taking of Evidence.*

At the second penalty trial the court gave defendant wide latitude to introduce evidence of the circumstances of the crime. Defendant recalled numerous witnesses from the guilt phase to raise doubts about the reliability of their inculpatory testimony, and challenged the accuracy of prosecution witnesses' testimony on cross-examination. One witness in the second category was Mrs. Davies: defendant spent much time challenging the reliability of her identification of him as the man who came to the door. The court overruled an eventual prosecution objection to the cross-examination, stating that the jury could listen to evidence regarding "the circumstances surrounding the case." But it reminded the jury that the previous "jury decided that Mr. DeSantis was in fact guilty of the crime." ▮▮▮ Nevertheless the court allowed the cross-examination of Mrs. Davies to continue.[16]

---

[16]Defendant complains that the court improperly curtailed his cross-examination of Mrs. Davies. The record reveals that by the time the court did so the questions had become at best only tangentially relevant. Defendant had tried the court's patience with his repetitious

### c. *Argument to the Jury.*

Defendant's strategy during argument was to emphasize the doubt about his role in the crimes that he had brought out in the evidentiary phase of the second penalty trial. He argued to the jury without opposition that "In considering the mitigating factors, you can examine whether there is a lingering doubt in your mind about the guilt of Stephen DeSantis." Later defendant described cases of people sentenced to death by conscientious juries but thereafter found innocent. The prosecutor objected that defendant was "simply preying on the fears of the jurors and . . . urging them not to follow the law." The court sustained the objection and admonished the jury that "the issue of guilt has already been determined and you are not to reweigh that evidence. That evidence has already . . . been heard and decided by another jury. [¶] Guilt is not an issue in this trial." A similar exchange occurred during defendant's rebuttal argument.

### d. *Deliberations.*

During deliberations the jury sent out a note inquiring, "We, the jury in the above-entitled action, request the following: 'To define if we accept as fact that Stephen DeSantis killed Edward Davies per page 6, 3(a) and 3(b).' "[17] The court reminded the foreman that the prior jury found that defendant personally did the killing. The next day the court refused a defense request for two supplemental instructions that would have told the jury, "You may consider any doubt you have about guilt of the defendant in deciding what penalty is appropriate" and "You may consider any doubts you may have about circumstances of the crime in deciding which penalty is appropriate."

### e. *New Trial.*

In support of defendant's new trial motion, Juror J. declared that initially he had some doubt about defendant's role, but he became convinced during deliberations that Masse had fired the initial shots and defendant had returned to kill Mr. Davies. Between these two statements, Juror J.'s declaration mentioned the court's instruction "not to consider doubts about guilt . . . ."

Juror R. declared she had no doubt defendant was guilty at the conclusion of the testimony. She also stated, "At the outset, in my opinion, most of the

cross-examination of Mrs. Davies, and it admonished him that his questioning needed to be better organized and thriftier of time. The court did not err in curtailing such cross-examination. (Evid. Code, § 352.)

[17]In other words, whether the jury was to accept that defendant either killed the victim directly or was not the triggerman but intended to aid in his murder.

jurors had some doubt about guilt, until such time as the judge explained that the prior jury had found DeSantis guilty, and the new jury had to accept that as a fact. [¶] One male juror did express doubt after the judge's instructions until portions of the penalty phase trial were reheard."

At the hearing on the new trial motion the court struck all of Juror J.'s declaration and the quoted portion of Juror R.'s declaration, probably as violating Evidence Code section 1150, subdivision (a), which forbids the admission of evidence of jurors' mental processes to test the validity of a verdict.

### 2. *Discussion.*

We detect no merit in any of defendant's assertions of error as a result of the foregoing proceedings.

 Relying on *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381], defendant contends he was entitled to have the jury consider, as a mitigating circumstance, lingering doubt about his guilt. As will be explained below, we agree. But to the extent that the court's rulings and the prosecutor's comments merely reminded the jury that it was not to redetermine *guilt*, those actions did not remove the question of lingering doubt from the jury, but only told it the truth: that in the penalty phase defendant's guilt was to be conclusively presumed as a matter of law because the trier of fact had so found in the guilt phase. (See *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1235 [275 Cal.Rptr. 729, 800 P.2d 1159].) To the extent they dwelt on the point that defendant's guilt had been established, therefore, we do not consign the court's rulings or the prosecutor's actions to the rubric of extinguishing lingering doubt, and accordingly find no error. Indeed, defendant conceded during closing arguments that the prior jury's determinations, including its specific findings that defendant had personally, intentionally and premeditatedly killed Edward Davies, were not subject to revisitation and that he was guilty of the crime. (See *id.* at pp. 1234-1235.)

Of course, guilt may be conclusively presumed as a matter of law and yet as a moral question the penalty phase jurors could personally retain some lingering doubt about whether defendant in fact killed Mr. Davies. But the record discloses that the jury heard a substantial amount of testimony on the point—evidence that furnished defendant with the fulcrum of his closing arguments, which he devoted to prying out doubts about his role during the robbery. (See *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1235.) Defendant cannot contend on appeal that he was denied the right to present evidence raising doubts about his guilt, nor does he do so: he concedes that "The

defense presented Masse's testimony largely to establish a doubt about appellant's having been the person who shot Mr. and Mrs. Davies."

We therefore interpret defendant's contention to mean that he had a right to have the jury instructed on that point. We are of a different view.

In *People* v. *Cox, supra,* 53 Cal.3d 618, 675-679, we explained that in *People* v. *Terry, supra,* 61 Cal.2d 137, the defendant was prevented from submitting any evidence or arguing that the jury should spare his life on the basis of lingering doubt about his guilt. (53 Cal.3d at p. 677.) Our holding in *Terry,* however, "neither imposed nor contemplated an obligation to instruct on lingering doubt. Nor could it have: Under the law at the time, the jury received virtually no instruction at the penalty phase, its task being to 'decide the question without benefit of guideposts, standards or applicable criteria . . . .' [Citation.] The sentencer's discretion has since become considerably guided and standardized by statute and constitutional imperative. While the defendant retains a necessary degree of evidentiary latitude in appealing for leniency, we discern no basis for extrapolating a concomitant duty to instruct on any specific nonstatutory extenuating factor. . . ." (*Id.* at p. 678.)

Defendant contends, however, that the jury in this case was not in the same position as one that would have participated in the guilt trial, because a jury that had heard both proceedings would be steeped in the nuances of the case, whereas the jury that decided his fate was in effect served the verdict of guilt on a platter without an opportunity to resolve any doubts, no matter how slight, about his role in the crimes. In principle the point is not without merit, but it is unpersuasive here.

To be sure, in *People* v. *Cox, supra,* 53 Cal.3d 618, the same jury decided guilt and penalty. (*Id.* at p. 641.) Inevitably there will be a tension between the legislatively stated preference not to retry the question of guilt at the second penalty phase trial (§ 190.4, subd. (b)) and the defendant's right to ensure that the jury consider evidence that might raise a doubt, albeit amorphous or slight, that his role was less heinous than the prior jury's findings established. Nevertheless, the circumstances of this case require us to reject defendant's contention that the court erred in not giving his proposed instructions. We need not decide whether in another case a lingering doubt instruction of some type might be proper (cf. *People* v. *Cox, supra,* 53 Cal.3d at p. 678, fn. 20; *People* v. *Thompson* (1988) 45 Cal.3d 86, 134 [246 Cal.Rptr. 245, 753 P.2d 37] [dictum in both]), for none was required here. As alluded to above, our exhaustive review of the record persuades us that defendant was able virtually to retry the guilt phase case under the guise of

introducing evidence of the circumstances of the crime to the penalty jury. Thus the jury was steeped in the nuances of the case, much as if the same jury had decided guilt and penalty. The effect of any instruction thus would only have been incremental. There was no violation of state law.

Nor do we discern an Eighth Amendment violation. The United States Supreme Court has refused to deny effect to some states' practice of prohibiting the consideration of residual doubts at the penalty phase, and has essentially found constitutionally sound the practice of penalty-only retrials despite the concerns that defendant now raises. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173 & fn. 6 [101 L.Ed.2d 155, 165, 108 S.Ct. 2320] [plur. opn.]; *id.* at pp. 187-188 [opn. of O'Connor, J., conc. in judg.].) The risk that a new jury will not have been steeped in the nuances of the guilt phase thus is not of constitutional dimension. (See *id.* at p. 174 [101 L.Ed.2d at p. 166] [plur. opn.], internal quotation marks omitted: "Our edict that, in a capital case, the sentencer . . . [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense [citation], in no way mandates reconsideration by capital juries, in the sentencing phase, of their residual doubts over a defendant's guilt.")

Moreover, even if a right existed under the Eighth Amendment to have the penalty jury consider lingering doubt, there was no error here, for, as explained above, we find that the court allowed defendant great latitude to raise such doubt. As the court reasoned in *Franklin* v. *Lynaugh, supra,* 487 U.S. at page 174 [101 L.Ed.2d at p. 166] (plur. opn.), "Most importantly, even if we were inclined to discern [a right to have residual doubt considered] in the Eighth Amendment, we would not find any violation of it *in this case.* For . . . nothing done by the trial court impaired petitioner's exercise of this 'right.' The trial court placed no limitation whatsoever on petitioner's opportunity to press the 'residual doubts' question with the sentencing jury."[18]

C. *Allegation of "Brown" Error.*

The court instructed the jury that if it concluded the aggravating circumstances outweighed the mitigating, "you shall impose the sentence of death." In *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440],

[18]Defendant also contends the proceedings violated a federal constitutional right to due process because state law created a liberty interest on his part. But even if such a right exists, we have explained that the court's rulings and prosecutor's actions did not violate state law. He also contends the proceedings violated his right to equal protection of the laws under the state and federal Constitutions. This claim is made without supporting argument and we reject it on that ground.

reversed on another ground *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we decided that this language could mislead the jury about its role in weighing the factors it found in mitigation or aggravation, and specified that in future trials the jury should be told that the weighing of the factors "does not mean a mere mechanical weighing of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. . . . To return a judgment of death, each of you must be persuaded that the [evidence of aggravating circumstances] is so substantial in comparison with the [evidence of] mitigating circumstances that it warrants death . . . ." (*Id.* at p. 545, fn. 19.)[19]

■ Defendant contends that the prosecutor and court misled the jurors during voir dire into believing that their personal feelings were to play no part in their evaluation of defendant's fitness to live—an error compounded by improper argument and improper instructions. We agree that the prosecutor made improper statements, but in light of the entire relevant record we do not agree that the jury entered the jury room under a misapprehension about its duty in evaluating the case. We thus find no prejudice.

During the individual sequestered questioning of several prospective jurors who eventually became jury members, the prosecutor incorrectly emphasized that the juror's personal view of defendant's fitness to live was irrelevant in deciding the issue of penalty. Typical was his colloquy with Juror J.:

"At one point you—the Judge was asking about your views concerning capital punishment and whether or not you could vote for the death penalty. I think your answer was something like you could vote for the death penalty if you deemed—deemed it was necessary.

"And I suppose that might be part of what you'd have to consider, but the legal scheme that we work in is—is to present evidence of aggravating

---

[19]In *Brown* we "recognized that when delivered in an instruction . . . mandatory-penalty-determination language might mislead jurors as to the scope of their sentencing discretion, to the defendant's prejudice, in violation of what we believed to be Eighth Amendment principles. (40 Cal.3d at p. 544, fn. 17.) Specifically, a juror might reasonably understand that language to define the penalty determination as 'simply a finding of facts' (*id.* at p. 540) or 'a mere mechanical counting of factors on each side of the imaginary "scale" ' (*id.* at p. 541). In other words, he might be misled as to the nature of the process by which penalty is to be determined. A juror might also reasonably understand the language to require him to vote for death if he finds that aggravation outweighs mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.)" (*People* v. *Marshall* (1990) 50 Cal.3d 907, 934 [269 Cal.Rptr. 269, 790 P.2d 676].)

factors about the defendant, the crime and so forth, and then there's evidence that can be presented that's called mitigating factors, . . . and your job as a juror would be to weigh the aggravating and the mitigating factors and make a decision based on which one outweighed the other.

"And in that sense, it's not a question of whether or not an individual juror would deem it appropriate or not in a particular case. It's more a question of weighing the evidence. You understand that?

"I understand.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"And could you work within that scheme, although in your own personal opinion, the defendant should not receive the death penalty? [¶] Even though, personally, you might feel if you—if you were the one that got to decide this without any direction of law, you might decide a different way.

"Oh, no, . . . not what I feel, you know."

To Juror O. the prosecutor said:

"Now, I think one of the refrains I heard from you or one of your statements was that, if you felt it was the right circumstances or it was an appropriate case, then you could vote to impose the death penalty, but I think by now you understand that these cases aren't presented for the individual consideration of twelve people to decide whether each of them feel it's appropriate[. T]here's this weighing process that goes on, and when you decide this issue, when you stack up the aggravating and . . . mitigating factors, and your verdict depends on which one outweighs the other, you follow what I'm saying?

"Yes.

"So, you might come to your own individual conclusion that there aren't the right circumstances under which you personally think that capital punishment is appropriate, but on the other hand, it's clear that the aggravating circumstances outweigh the mitigating circumstances.

"Under these conditions, would you follow the law and impose the death verdict?

"Yes."[20]

Moreover, in what defendant aptly characterizes as a "kind of one-two punch," the court told many jurors that their duty was to vote for death if the aggravating factors outweighed the mitigating.

The overall effect was to strongly suggest to certain jurors, at the time of voir dire, that they could not examine their own beliefs and consciences to consider whether defendant should receive a sentence less than death. The colloquies came close to telling those jurors that the process was a mechanical weighing one.

In *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669], we noted that the United States Supreme Court has found a death penalty trial constitutionally defective if jurors are " 'led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. . . .' " (*Id.* at p. 254.) In closing argument the prosecutor told the jurors that to inject their own personal feeling was to step outside the bounds of the law and violate their oaths. (*Id.* at p. 255.) We reversed the judgment of death in light of federal decisions and *People* v. *Brown*, *supra*, 40 Cal.3d 512. (45 Cal.3d at pp. 256-257.)

The defects in the prosecutor's questions and the court's comments, however, were cured in this case. Many weeks elapsed between voir dire and the time of the closing arguments and the instructions. In his closing argument defendant urged the jury to take into account any lingering doubt and his family background in evaluating the case. He further argued that the process of determining the penalty was not one of counting or mechanical weighing, and that a single mitigating factor could outweigh all aggravating factors. The prosecutor did not attack this argument as improperly stating the law, and the argument was buttressed when the court instructed the jury that a single mitigating factor could outweigh all aggravating factors, that the jury was not to engage in a mechanical weighing process, and that such factors as defendant's personal qualities, potential for rehabilitation, and the jurors' senses of sympathy and mercy could be considered. Despite these curative instructions and defendant's closing arguments, the jury found that the aggravating factors outweighed the mitigating and imposed the death penalty. We do not agree that the jurors were, in the end, playing an impermissibly limited or mechanical role in making their decision under state law or the federal Constitution, even though certain jurors may have been initially misled about that role. (See *People* v. *Howard* (1992) 1 Cal.4th 1132, 1187-1189 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

---

[20]We have omitted the labels "Q" and "A" from these colloquies.

### D. *Denial of Motion to Suppress Identifications.*

In aggravation, defendant was charged with the commission of unadjudicated prior offenses. Among them were the robberies of Larry Lang, Michael McGee, and Cynthia Senna.

All three identified defendant with considerable certainty from lineup photographs. At a hearing, he moved to suppress the pretrial identifications and any in-court identifications on the ground that the lineup procedure was too suggestive. Following the testimony of Sacramento Sheriff's Department Detective Peretti, the court denied the motion, finding no unfairness in the procedure. Witnesses Lang and Senna testified at the penalty trial that they had made the lineup identifications, the specifics of which are discussed below. The direct examination of McGee failed, apparently through inadvertence, to tie McGee's earlier identification explicitly to defendant, though McGee identified defendant in court as one of the men who robbed him. On appeal, defendant renews his contention, arguing that the lineup procedure denied him due process of law.

As noted above, the applicable approach to a claim of violation of due process by an unreliable extrajudicial identification was set forth in *People* v. *Gordon, supra,* 50 Cal.3d 1223, 1242, in which we explained: "The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ."

We need not reach the second question because the procedure was not unduly suggestive. At a hearing outside the jury's presence, Detective Peretti, called as a witness for defendant, testified that he showed witnesses Lang, McGee and Senna in separate interviews a set of five photographs taken from Department of Motor Vehicles (DMV) records, including a photograph of defendant. None of the three witnesses was able to identify defendant from the DMV photographic lineup. Our own examination of defendant's photograph in that lineup shows him to be beardless and to have a wide handlebar mustache.

Later Detective Peretti obtained a California state prison photograph of defendant and included it in a lineup with four other Sacramento County

Sheriff's Department photographs that he displayed, again in separate interviews, to the three witnesses.[21] The prison photograph shows a quite different picture of defendant: he appears to have a goatee and a definite but thin mustache, and he is generally more unkempt looking than in the DMV photograph.

This time each witness, according to the detective's testimony, identified defendant: Lang stated, "This looks like one of the guys who robbed me"; McGee stated, "This looks like the guy right here"; and Senna stated, "I'd say this is the guy."[22]

Defendant's photograph was the only one common to the two lineups shown to each witness. It is on that fact that he predicates his claim of undue suggestiveness. We do not agree that the procedure was too suggestive.

The photographs themselves are the most significant item in support of the court's ruling that no unfairness occurred. They show a quite different likeness of defendant. We do not perceive the first photograph as having had any subliminal suggestive effect on a witness asked to identify a possible robber from the second photograph.

Moreover, in both lineups potentially suggestive material, such as the prison identification of defendant in the custodial photographic lineup and indicia of identity in the DMV photographic lineup, were excised so that the witnesses would see only the likenesses of the lineup participants and, in the case of the DMV photographs, DMV notations not relevant to identification. Under these circumstances, not contested by defendant, we find no error and no violation of due process.

### E. Claims of Error in Consideration of Rape Charge.

The prosecution presented, as an aggravating circumstance, evidence that defendant raped or was an aider and abettor in the rape of Cheryl A. in

[21]Although the record contains a prison photograph showing defendant's profile and frontal view, Detective Peretti modified the display so that only the frontal views of defendant and the four sheriff's department pictures were visible. This manicuring was part of a process to ensure that no photograph stood out from the others: the sheriff's photographs did not feature a profile. The photographs were also cropped so that the agency that had taken them was not identified.

[22]Because these statements were presented through Detective Peretti's testimony, of course, all three statements would have been hearsay if admitted for the truth of the matter asserted. Obviously defendant had summoned Detective Peretti not to establish the declarants' identifications of him but to show that the procedures used to obtain those identifications were unduly suggestive. In the case of Lang, defendant was therefore careful to obtain a ruling that the statement was not admitted for its truth; with regard to the other two statements, no such ruling was sought.

January 1973. The prosecution introduced evidence susceptible of the inference that defendant and one Jesse Ford entered the house occupied by Ms. A. and Richard R., her roommate, at gunpoint while Masse and one Scott Paxton waited outside in a car. The robbery's purpose was to obtain marijuana and perhaps other valuable property. The two robbery victims were ordered to lie on Mr. R.'s bed and were covered so as to prevent their seeing anything. Mr. R. lapsed into unconsciousness as a result of the head coverings; thereafter Ms. A. was raped by one of the two men.

Later defendant argued the prosecution had failed to meet its burden of proving his guilt of the rape of Ms. A. The prosecution did bear the burden of proving the fact of that rape as an instance of the "presence or absence of . . . criminal activity . . . which involved the use . . . of force or violence . . . ." (§ 190.3) beyond a reasonable doubt. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 778 [215 Cal.Rptr. 1, 700 P.2d 782].) Defendant asked that "the jury be instructed . . . to disregard all evidence regarding the alleged rape of Cheryl A." The court asked, "How about rape in concert?" Defendant replied, "There's been no evidence to that." The court decided, "Well, there were two people. One of them did it apparently, according to her. [¶] Your request will be denied."

■■■ Despite the court's comment, there was no instruction regarding rape in concert, and defendant does not raise the issue on appeal. Rather, he contends that the prosecution's evidence revealed only a 50 percent chance or less that he committed the rape, an insufficient showing. (*People* v. *Allen* (1985) 165 Cal.App.3d 616, 626 [211 Cal.Rptr. 837].) He also contends there was insufficient evidence to establish guilt as an aider and abettor, and that the jury instructions failed to clarify, in considering defendant's liability as an aider and abettor, that the jury was to decide whether rape was a natural and probable consequence of robbery. In sum, defendant maintains his rights under state law and the federal due process clause were violated.

We need not address the substance of defendant's contentions because we conclude nothing would be gained by a conclusion that the court erred in whole or in part. There is no reasonable possibility, in our view, that defendant would have received a less severe verdict had the court instructed the jury to disregard the evidence of the rape.

F. *Failure to Give Accomplice Instruction.*

As explained above, defendant called Masse during the penalty phase to raise doubts about defendant's role in the Davies shootings. Unfortunately for defendant, the record discloses that Masse's testimony did defendant

considerable damage. Recognizing that fact, defendant asked the court for an instruction that Masse was an accomplice as a matter of law whose testimony must be corroborated (CALJIC No. 3.16 (4th ed. 1979 rev. bound vol.); see § 1111). The prosecution argued that such an instruction was proper at the guilt phase but not at the penalty phase, at which time guilt had been decided, and that defendant had called Masse as his own witness and of course would not corroborate him once his testimony had proven more damaging than helpful. Defendant agreed that the wording of former CALJIC No. 3.16 was improper at the penalty phase because it would have told the jury, "If the crime of murder was committed by anyone, the witness Gary Masse was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration." He accepted the court's offer to submit a different instruction for consideration. It is undisputed that he thereafter failed to do so.

■■■ The People contend that by failing to submit a different instruction on this topic defendant waived the claim on appeal. Citing authority that the instruction must be given on the court's own initiative (*People* v. *Robinson* (1964) 61 Cal.2d 373, 394 [38 Cal.Rptr. 890, 392 P.2d 970]), defendant contends the court was required to devise a proper instruction itself.

We cannot accept defendant's contention. He was not entitled to a corroboration instruction on a witness he himself called. We held in *People* v. *Williams* (1988) 44 Cal.3d 883, 958-959 [245 Cal.Rptr. 336, 751 P.2d 395], that a defendant who introduced evidence of his own prior crimes had no right to an instruction that they had to be proved beyond a reasonable doubt. By a parity of reasoning, defendant cannot successfully maintain that he was entitled to an instruction that the testimony of a witness he called must be corroborated. We perceive no violation of state law or, against defendant's urging, of any federal due process right.

G. *Curtailing of Cross-examination in Sodomy Charge.*

The People alleged in aggravation that defendant committed the unadjudicated offense of sodomy on an inmate at the Sacramento County jail in January 1984, while defendant was awaiting trial in this case.

The inmate, who stood at least seven feet tall and was a skilled disciple of karate, but was very slender, testified that he was in a common room when several inmates seized him so that defendant could and did commit a forcible act of anal intercourse. On cross-examination, defendant asked the inmate more than once whether he had ever engaged in consensual sexual activity at the jail before or after the January incident. This he denied. Defendant then

asked in somewhat different form a question he had already asked without objection: whether the inmate had, after the January incident, "participate[d] in homosexual acts anywhere." As the prosecutor sat silently, the inmate himself objected to this question as irrelevant and the court agreed, sustaining the witness's objection on that ground.[23]

The court also forbade an inquiry into the circumstances surrounding the inmate's conviction of felonious assault on prison guards. Defendant wanted to learn whether there was a discrepancy between the number of prison guards the inmate had assaulted and the single charge brought against him for that incident. The witness, who was hard of hearing, either did not hear or ignored the prosecutor's objection on relevance grounds to a question about the number of guards involved, and answered that he had attacked three officers. The court ruled too late, sustaining the objection and stating, "You may not go beyond asking him whether he's had a felony [conviction]." The court did not admonish the jury to disregard the inmate's statement.

Defendant argues the court violated state law and the federal confrontation, due process, and cruel and unusual punishments clauses when it sustained the objections.

### 1. *Testimony About the Sodomy Incident.*

 Regarding the sodomy-testimony objection, defendant relies on Evidence Code former section 1103, subdivision (b)(1) (see now *id.*, subd. (c)(1)), California's response to demands that evidence of alleged rape victims' prior sexual conduct be severely limited in a criminal trial. That section prescribes in pertinent part that ". . . except where the crime is alleged to have occurred in a local detention facility . . . evidence of specific instances of the complaining witness' sexual conduct . . . is not admissible by the defendant in order to prove consent by the complaining witness."

Contrary to defendant's view, Evidence Code section 1103's limitation on cross-examination "except where the crime is alleged to have occurred in a local detention facility" does not mean that because the act took place in county jail the evidence was per se admissible. Its admissibility would still

---

[23]The question did not contain the word "consensual," but the record makes clear that defendant was referring to consensual homosexual conduct. The initial question on the subject asked the inmate about an "exchange [of] homosexual favors" after the January attack. Earlier a guard gave double hearsay testimony—to which there was no objection—that he had heard that the inmate "wrote a letter or something that said he exchanged sexual favors, but it was after this thing happened."

be subject to the court's power to exclude irrelevant evidence. (Evid. Code, § 350.)

The court's ruling that the evidence was irrelevant, on the inmate's objection, was unquestionably correct. At least with regard to third parties, "Knowledge of past consensual gay sex alone is not sufficient to establish a reasonable belief in consent. There must be evidence during the encounter in question which reasonably led to a belief in consent. The evidence would become relevant only if it were combined with [other] factors . . . , such as prior activity demonstrating particular communicative behavior or special circumstances giving the evidence higher probative value." (Comment, *Rejecting Unreasonable Sexual Expectations: Limits on Using a Rape Victim's Sexual History to Show the Defendant's Mistaken Belief in Consent* (1991) 79 Cal.L.Rev. 541, 574-575, fn. omitted.)

What is true for past behavior is also true for future conduct: a person's consensual sexual conduct on one occasion is, without more, irrelevant to prove consent on another. (See *State* v. *Hudlow* (1983) 99 Wn.2d 1 [659 P.2d 514, 519-520]; *Kvasnikoff* v. *State* (Alaska Ct.App. 1983) 674 P.2d 302, 304-306 & fn. 6; Note, *If She Consented Once, She Consented Again—A Legal Fallacy in Forcible Rape Cases* (1976) 10 Val.U.L.Rev. 127, 138, fn. 55 [" 'Actually, giving away sex has no more in common with rape than giving away money has in common with armed robbery.' "].)

Moreover, defendant's inquiry would have led to the introduction of impermissible character evidence by portraying the inmate as a person to whom the jury should accord less respect or less believability because of his homosexuality—an attempt to cater to the possibility of popular prejudice. (See *McGill* v. *Duckworth* (N.D.Ind. 1989) 726 F.Supp. 1144, 1147-1148, affd. in part & revd. in part (7th Cir. 1991) 944 F.2d 344.)

In sum, the line of questioning that defendant sought to pursue was improper on both relevance and character grounds, and the ruling sustaining the objection was correct. For that reason, we discern no violation of any federal constitutional right. Defendant's entitlement to due process of law does not encompass a right to any process of his own choosing, including the right to introduce irrelevant evidence of sexual history. (*People* v. *Blackburn* (1976) 56 Cal.App.3d 685, 690 [128 Cal.Rptr. 864].) The exclusion of irrelevant evidence of later consensual sexual activity did not violate defendant's confrontation rights. (*Ibid.*; *U.S.* v. *Torres* (9th Cir. 1991) 937 F.2d 1469, 1473; see also *State* v. *Gulrud* (Ct.App. 1987) 140 Wis.2d 721 [412 N.W.2d 139, 142, 81 A.L.R.4th 1063]; *State* v. *Wattenbarger* (1989) 97 Ore.App. 414, 418 [776 P.2d 1292, 1294].) And we do not accept the

premise that the pursuit of irrelevant evidence would have led to more precise factual determinations; therefore, we reject defendant's Eighth Amendment claim as well.[24]

### 2. *Testimony About Victim's Prior Conviction.*

 We next turn to defendant's contention that the court erred under state law and the federal Constitution in limiting his inquiry into the circumstances of the victim's prior conviction. As defendant notes, traditionally cross-examination questions regarding witnesses' prior felonies must be limited to the fact of the conviction and the nature of the crime; the examiner cannot explore the details or circumstances surrounding the crime. (*People* v. *Gomez* (1957) 152 Cal.App.2d 139, 142-143 [313 P.2d 58]; see Evid. Code, § 788.) Defendant maintains that this rule was abrogated by the passage of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)), which forbids the exclusion of relevant evidence in a criminal proceeding. But Proposition 8 postdates the crime, and therefore does not apply to this case. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 115 [279 Cal.Rptr. 276, 806 P.2d 1311].) Nor do we perceive any federal constitutional error.

#### · H. *Failure to Instruct that Hearsay Testimony Regarding Utah Robbery Must Be Corroborated.*

Defendant was charged in aggravation with the unadjudicated offense of the robbery of a man in West Jordan, Utah. There was evidence that Masse had participated. A prosecution investigator testified that Masse had described the operation; the investigator related to the jury Masse's statements about the details of the robbery. In closing argument the prosecution again described the robbery's details and told the jury that because the testimony came from the investigator, Masse's testimony need not be corroborated on that point. When giving instructions, the trial court told the jury that an accomplice's testimony was insufficient to permit the jury to find that defendant had committed the unadjudicated prior crime unless corroborated by other evidence, and that if the robbery was committed by anyone, Masse

---

[24]Also, defendant's reliance on Evidence Code section 1103, subdivision (a) is faulty because his defense was not consent (see *id.*, former subd. (b)(1)) but alibi. To circumvent that threshold difficulty, defendant contends in his reply brief that he would have had "a plausible basis" for advancing a defense of consent had the trial court not made its ruling. We cannot take defendant's point seriously. The transcript reveals that the court ruled after the inmate testified during defense cross-examination that three people held him while defendant sodomized him, and that the accomplices held his back down on a table and kept his legs in the air while defendant was committing the act of sodomy. On direct examination, the inmate had expressly testified he did not consent to the act. Given this testimony, we find defendant's assertion that he was precluded from advancing a defense of consent to border on the frivolous.

was an accomplice as a matter of law and his testimony was subject to the corroboration requirement. Defendant does not state that he asked for any different instruction regarding this issue. ■ He contends now that the instructions were insufficient to alert the jury to the fact that Masse's statements must be corroborated even though admitted through the investigator's testimony.

We disagree. We decline in this case to depart from our reasoning in *People* v. *Andrews, supra,* 49 Cal.3d 200. In *Andrews* we explained that a trial court has no duty to modify the corroboration instructions on its own motion to provide that they apply to out-of-court as well as in-court statements. (*Id.* at p. 214.) To be sure, in *Andrews* "Neither the trial court nor the parties ever suggested to the jury that, with respect to the corroboration requirement, it should distinguish between . . . out-of-court and in-court statements." (*Id.* at pp. 214-215, fn. omitted.) Here the prosecution did in fact make an incorrect statement of the type we noted was missing in *Andrews.* But defendant failed to timely complain of the prosecution's misstatement. We therefore decline to consider its effect on appeal.[25]

I. *Failure to Instruct Jury to Consider Masse's Sentence.*

■ Defendant contends the court erred under the Eighth Amendment in failing to remind the jury that Masse received a sentence of life imprisonment for the Davies crimes and to instruct, as he requested, that in determining the proper penalty the jury could consider the disparity of treatment between Masse and defendant in selecting the sentence to be imposed.

As the People observe, we have repeatedly rejected contentions that the disposition of accomplices' cases may be considered as a factor in mitigation. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 69-71 [246 Cal.Rptr. 209, 753 P.2d 1].) The introduction of evidence of an accomplice's sentence is not specified as a factor in mitigation by the Penal Code, nor does such evidence bear any relevance to the jury's determination of the penalty to be meted out to an individual defendant. Therefore an instruction was not required, either under state law or the Eighth Amendment.

J. *Constitutionality of Jury's Consideration of Unadjudicated Prior Offenses as Aggravating Factor.*

Defendant contends it was a violation of the Fifth, Eighth and Fourteenth Amendments to admit evidence of unadjudicated criminal activities as a

---

[25]Defendant also contends that his federal constitutional rights were violated. For the reason given in the text, we also decline to address defendant's federal claims.

factor in aggravation. We see no reason to reconsider our contrary conclusion. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 106 [270 Cal.Rptr. 817, 793 P.2d 23].) Moreover, defendant offers his argument without sufficient attention to the posture of his case, for he maintains that a jury that has convicted him of capital murder is too biased to receive evidence of the unadjudicated offenses impartially. In defendant's case, the original jury had long been absent from the courtroom when 12 new jurors heard evidence of unadjudicated prior offenses.

K. *Introduction of Evidence of Certain Unadjudicated Offenses for Which the Statute of Limitations Had Run.*

Defendant argues that the statute of limitations barred the introduction of evidence of certain crimes introduced in aggravation to prove unadjudicated prior offenses. We have recently held otherwise. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 529-530 [268 Cal.Rptr. 126, 788 P.2d 640].)

L. *Constitutionality of Statutory Sentencing Scheme.*

Defendant contends that, as interpreted in our prior decisions, the statutory scheme under which he was sentenced is constitutionally defective. Specifically, he maintains that our conclusion that jury unanimity is not required to find that a defendant committed unadjudicated prior offenses (*People* v. *Benson* (1990) 52 Cal.3d 754, 810-811 [276 Cal.Rptr. 827, 802 P.2d 330]) violates rights that he asserts exist under the Sixth Amendment, the Fifth Amendment as applied to the states, and the Eighth Amendment. We decline to alter our views.

M. *Failure to Delete Irrelevant Aggravating Circumstances.*

Defendant contends the court committed an error of constitutional magnitude in failing to delete inapplicable aggravating circumstances from its instructions. There was no error. (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 972 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

N. *Failure to Instruct Jury Not to Consider Extraneous Aggravating Factors.*

 Defendant contends the court erred in refusing an instruction that would have limited the jury's consideration of aggravating factors to those specifically contained in section 190.3. We agree. (*People* v. *Gordon, supra,* 50 Cal.3d 1223, 1275, fn. 14.) But we find no prejudice, for defendant does not demonstrate that the jury was affirmatively misled as to the scope of its

inquiry: he does not argue that the jurors were told to or did consider factors lying outside the scope of section 190.3. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1324 [248 Cal.Rptr. 834, 756 P.2d 221].)

O. *Miscellaneous Contentions.*

Defendant contends that the court erred under state law and violated his Fifth and Eighth Amendment rights as applied to California by permitting the prosecutor to argue that defendant's age was an aggravating factor and thereafter instructing the jury to consider age without specifying whether the factor was mitigating or aggravating. Defendant did not assign misconduct to the prosecutor's argument,[26] and we will not entertain his claim on appeal. We have repeatedly rejected both age-related claims in any event. (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 112.)

Finally, defendant contends his sentence must be set aside because the court refused to instruct the jury that it could impose a sentence of death only if convinced beyond a reasonable doubt that the aggravating factors outweighed the mitigating and death was the proper penalty. This claim, too, we have rejected. (*People* v. *Pinholster, supra,* 1 Cal.4th at pp. 973-974.) And in any event one of defendant's counsel apparently stated that section 190.3 specified no burden at all, though his other counsel then asked for a reasonable doubt instruction, which the court refused. We see no reason to reconsider our view.

## V. Disposition

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied September 17, 1992, and the opinion was modified to read as printed above.

---

[26]Indeed, defendant's counsel opined that age could be either aggravating or mitigating.