Filed 7/12/23  P. v. Woodfill CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL JASON WOODFILL,<br><br>    Defendant and Appellant. | D079814<br><br><br>(Super. Ct. No. SCE384091)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 23, 2023, be modified as follows:

On page 10, at the end of the last sentence of the first paragraph (beginning with "As *Nieto Benitez* establishes, . . . ."), add as footnote 4 the following footnote, which will require the renumbering of all subsequent footnotes:

> 4      In a petition for rehearing, filed July 7, 2023, Woodfill argued that based on our Supreme Court's June 29, 2023 opinion in *People v. Reyes* (June 29, 2023, S270723) __ Cal.5th ___ [2023 WL 4242765], it is

no longer true that a trial court has no sua sponte duty to modify an implied malice jury instruction to include the alternative formulation expressed in the *Thomas* test. We reject the argument, as *Reyes* does not purport to address, let alone overrule, the holding in *Nieto Benitez*, *supra*, 4 Cal.4th at page 111, that no such sua sponte duty exists.

There is no change in judgment.

The petition for rehearing is denied.

HUFFMAN, Acting P. J.

Copies to: All parties

2

Filed 6/23/23  P. v. Woodfill CA4/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL JASON WOODFILL,<br><br>    Defendant and Appellant. | D079814<br><br><br>(Super. Ct. No. SCE384091) |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Donald W. Ostertag and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael Jason Woodfill of second degree murder (Pen. Code, § 187, subd. (a))[1] after he drove under the influence of alcohol and struck and killed a pedestrian. The trial court sentenced Woodfill to an indeterminate prison term of 15 years to life.

Woodfill contends (1) the trial court erred by refusing to instruct the jury with his proposed modification to CALCRIM No. 520, regarding implied malice; (2) the trial court should have sua sponte instructed on either vehicular manslaughter (§§ 191.5, subds. (a), (b), 192, subd. (c)) or involuntary manslaughter (§ 192, subd. (b)) as a lesser included offense of murder; and (3) the trial court prejudicially erred in allowing the People to show the jury a photograph of the victim while she was alive.

We conclude that Woodfill's arguments lack merit, and we accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of August 27, 2018, Woodfill was driving his large pickup truck in a northbound direction on a two-lane road. After drifting onto the right-hand dirt shoulder, Woodfill made a sharp left turn back onto the road and lost control of his vehicle. Woodfill's truck struck S.G., who was jogging. The force of the impact launched her down the embankment next to the southbound side of the road. Woodfill's truck plunged down the same embankment. Woodfill was unharmed, but S.G. died from her injuries.

During a field sobriety test at the scene of the accident, a law enforcement officer concluded that Woodfill was intoxicated. Blood drawn more than two hours after the accident showed a blood alcohol content of

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

2

between .203 to .227 percent, which is equivalent to nine to 10 standard alcoholic drinks. Based on certain assumptions about when the alcohol was consumed, an expert calculated that Woodfill's blood alcohol content at the time of the accident would have been between .20 and .28 percent. An investigation by law enforcement determined that driving under the influence was a factor in the collision, along with an unsafe turning movement.

An amended information charged Woodfill with one count of murder. At trial, the jury heard evidence that Woodfill had a history of convictions for driving under the influence. In connection with those convictions, Woodfill was warned that if he continued to drink and drive, he risked being convicted of murder. In closing argument to the jury, defense counsel argued, among other things, that jurors should not find Woodfill guilty of murder because, other than having consumed alcohol, there was no evidence that Woodfill was driving in an unsafe manner. The jury returned a verdict of guilt, and the trial court sentenced Woodfill to a prison term of 15 years to life.

## II.

## DISCUSSION

A. *The Trial Court Did Not Err in Refusing Defense Counsel's Proposed Modifications to CALCRIM No. 520 on the Issue of Implied Malice*

We first consider Woodfill's contention that the trial court erred in rejecting defense counsel's proposed modification to CALCRIM No. 520, which instructs on the elements for murder.

"A proper pinpoint instruction must be given at a defendant's request." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 498.) "The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' "

3

(*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.)  We apply the de novo standard of review when determining whether the trial court erred in refusing to give a requested pinpoint instruction.  (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

Murder can be based on either express or implied malice.  (§ 188, subd. (a).)  The People's theory of murder was that Woodfill acted with implied malice when he drove under the influence.

The standard version of CALCRIM No. 520, as given by the trial court in this case, contains the following language regarding implied malice:

> "The defendant had implied malice if:
>
> "1.  He intentionally committed the act;
>
> "2.  The natural and probable consequences of the act were dangerous to human life;
>
> "3.  At the time he acted, he knew his act was dangerous to human life;
>
> "AND
>
> "4.  He deliberately acted with conscious disregard for human life.
>
> [¶] . . . [¶]
>
> "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."  (Italics omitted.)

4

Defense counsel requested that the trial court modify CALCRIM No. 520 by replacing the second sentence of the final paragraph set forth above, as follows:

> "An act causes death if the death is the direct, natural, and probable consequence of the act, and that death would not have happened without the act. *The defendant must have subjectively known that the act was highly likely to result in death if nothing unusual intervened.* In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."[2] (Italics added.)

[2] Defense counsel also requested that CALCRIM No. 520 be modified in other respects, but Woodfill did not argue in his appellate briefing that the trial court erred in rejecting those modifications. Indeed, Woodfill's opening appellate brief specifically states that his argument is based solely on the trial court's failure to instruct that "[t]he defendant must have subjectively known that the act was highly likely to result in death if nothing unusual intervened." For the first time at oral argument, counsel for Woodfill referred to *other* portions of defense counsel's proposed jury instruction that did not describe a defendant's *subjective* knowledge. In particular, he cited defense counsel's request that the trial court instruct as follows: "If you find the defendant was driving under the influence, you cannot find the defendant guilty of murder unless you also find that the defendant committed an additional act, which was so dangerous to human life that it was highly probable to result in death"; and "The combination of driving a vehicle while under the influence of an alcoholic beverage and violating a traffic law is alone insufficient to establish an act that is highly likely to kill." Counsel contended at oral argument that the trial court erred in not instructing with that language, either as proposed or after modifying it. The argument is untimely because it was raised for the first time during oral argument. (*People v. Carrasco* (2014) 59 Cal.4th 924, 990 [" 'Obvious reasons of fairness militate against consideration of an issue raised initially' at oral argument."].) We accordingly do not consider it. (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6 ["An appellate court is not required to consider any point made for the first time at oral argument, and it will be deemed waived."].)

5

The trial court rejected defense counsel's requested modification, explaining that the proposed instructions would confuse the jury.

Woodfill argues that the trial court erred in rejecting his proposed modification because it was a correct statement of the law based on *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), in which our Supreme Court first established that, where implied malice is present, a defendant may be found guilty of second degree murder upon facts which also would support a charge of vehicular manslaughter. (*Id.* at pp. 298-299.) As we will explain, Woodfill's argument lacks merit because his requested modification is not an accurate statement of the applicable law, and the trial court therefore properly rejected it.

We begin our analysis by focusing on the discussion of implied malice set forth in *Watson*, on which Woodfill premises his argument. In the course of its discussion, *Watson* identified two alternative formulations for implied malice. "We have said that second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citation.] *Phrased in a different way*, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Watson, supra,* 30 Cal.3d at p. 300, italics added.) The first formulation of implied malice set forth in *Watson* is based on *People v. Phillips* (1966) 64 Cal.2d 574, 587, and is often referred to as the *Phillips* test. (*People v. Knoller* (2007) 41 Cal.4th 139, 152 (*Knoller*).) The second formulation of implied malice set forth in *Watson* is based on Justice Traynor's concurring opinion in *People v. Thomas*

(1953) 41 Cal.2d 470, 480, and is often referred to as the *Thomas* test. (*Knoller*, at p. 152.)

Since *Watson* was decided, our Supreme Court has repeatedly explained that the *Thomas* test and the *Phillips* test are substantively the same. (*Knoller*, at p. 152; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104 (*Nieto Benitez*); *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219-1222.) "[T]he two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Nieto Benitez*, at p. 111.) Indeed, in *Nieto Benitez*, our Supreme Court specifically rejected the argument that the trial court had a sua sponte duty to modify the form jury instruction on implied malice to include the "high probability" language contained in the *Thomas* test. (*Ibid*.)

Woodfill argues that because *Nieto Benitez* limited its discussion to whether a trial court has a *sua sponte* duty to instruct with the *Thomas* test, our Supreme Court has not foreclosed the possibility that a trial court has a duty to modify a form jury instruction, *when requested by the defendant*, to reflect the *Thomas* test. Woodfill contends that because the *Thomas* test has never been disapproved, it is still good law. He argues that the trial court accordingly should have given his pinpoint instruction, which he characterizes as substantively the same as the *Thomas* test. Specifically, Woodfill equates the phrase "highly likely to result in death" in his proposed modification with the phrase "high probability that it will result in death" in the *Thomas* test. (*Watson, supra,* 30 Cal.3d at p. 300.)

We need not, and do not, decide whether a trial court might, under appropriate circumstances, be required to instruct with the *Thomas* test if a defendant requests it to do so. Here, defense counsel simply did not request

7

an accurate version of the *Thomas* test in the trial court. The *Thomas* test describes the *objective* component of implied malice, describing *the act itself* that the defendant commits. (*Watson, supra*, 30 Cal.3d at p. 300 ["malice may be implied when defendant does *an act with a high probability* that it will result in death" (italics added).] Here, however, defense counsel requested an instruction describing the *subjective* component of implied malice, namely that "[t]he defendant must have subjectively known that the act was highly likely to result in death if nothing unusual intervened." As we will explain, that statement of the *subjective* component of implied malice was expressly disapproved by our Supreme Court in *Knoller, supra*, 41 Cal.4th 139.[3]

In *Knoller*, the trial court granted the defendant's new trial motion after analyzing the issue of implied malice using the *Thomas* test. (*Knoller, supra*, 41 Cal.4th at p. 157.) In so doing, the trial court "stated that a killer acts with implied malice when the killer '*subjectively knows,* based on everything, that the conduct that he or she is about to engage in has a *high probability of death* to another human being' and thus the issue in this case was 'whether or not as a *subjective* matter and as a matter of law [the defendant] *knew* that there was a *high probability*' that her conduct would result in someone's death." (*Ibid.*) Our Supreme Court explained that the trial court's analysis was flawed because " 'high probability of death' is the *objective,* not the *subjective,* component of the *Thomas* test, which asks whether the defendant's act or conduct 'involves a high probability that it will result in death.' [Citation.] The *subjective* component of the *Thomas* test is

_____

3    Because the parties' original appellate briefing did not discuss the significance of the fact that defense counsel's proposed instructional language concerned the *subjective* component of implied malice, we afforded the parties an opportunity to provide supplemental briefing addressing that subject.

whether the defendant acted with 'a base, antisocial motive and with wanton disregard for human life.' [Citation.] Nor does the *Phillips* test require a defendant's awareness that his or her conduct has a *high probability* of causing death. Rather, it requires only that a defendant acted with a 'conscious disregard for human life.' " (*Ibid.*) "[I]mplied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Id.* at p. 143.) Therefore, "in treating the objective component of the *Thomas* test as the subjective component of that test, the trial court applied an erroneous definition of implied malice . . . ." (*Id.* at p. 157.)

Woodfill's proposed modification of CALCRIM No. 520 revealed precisely the same flaw as the trial court's analysis in *Knoller*. Woodfill proposed an instruction stating that "[t]he defendant must have subjectively known that the act was highly likely to result in death if nothing unusual intervened." However, "in treating the *objective* component of the *Thomas* test as the *subjective* component of that test," the proposed instruction incorrectly stated the applicable legal standard. (*Knoller, supra*, 41 Cal.4th at p. 157, italics added.) Accordingly, the trial court properly rejected defense counsel's proposed modification.

In his supplemental briefing, Woodfill argues, "[E]ven assuming the high probability of death test of *Thomas* is incorrect with respect to the subjective component of implied malice, it is correct with respect to the objective component of implied malice. And because *Knoller* does not undermine this conclusion, the trial court should have modified the requested instruction to make it clear it applied to the objective component of implied malice and should have given the instruction as so modified. This could have been done by changing the requested instruction so it reads: 'To constitute

implied malice the defendant's act must have been highly likely to result in death if nothing unusual intervened.' " At oral argument, counsel for Woodfill again contended that the trial court had a sua sponte duty to transform defense counsel's proposed request for an instruction on the defendant's *subjective* knowledge to an instruction reflecting the *Thomas* test's *objective* component. We reject the argument. The trial court was not required, sua sponte, to modify defense counsel's proposed instruction to turn it into an instruction on the *Thomas* test for the objective component of implied malice. As *Nieto Benitez* establishes, because the *Phillips* test correctly states the law, a trial court has no sua sponte duty to instruct using the *Thomas* test when an instruction using the *Phillips* test is *already* being given. (*Nieto Benitez, supra,* 4 Cal.4th at p. 111.)

B.    *The Trial Court Did Not Err in Failing to Sua Sponte Instruct With Either Vehicular Manslaughter or Involuntary Manslaughter As a Lesser Included Offense of Murder*

Woodfill next argues that the trial court erred in not instructing the jury on either vehicular manslaughter or involuntary manslaughter as a lesser included offense of murder.

Although defense counsel did not argue in the trial court that the jury should be instructed on any lesser included offenses, "[a] trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404 (*Shockley*).) However, "a defendant has no unilateral right to an instruction on an uncharged offense that is not necessarily included within a charged offense." (*People v. Yeoman* (2003) 31 Cal.4th 93, 129.)

"To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory

pleading test. 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*Shockley*, *supra*, 58 Cal.4th at p. 404.) "When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense." (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)[4] "On appeal, we independently review whether a trial court erroneously failed to instruct on a lesser included offense." (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

1. *Vehicular Manslaughter*

Woodfill's first contention is that the trial court should have instructed on vehicular manslaughter (§§ 192, subd. (c), 191.5, subds. (a), (b)) as a lesser included offense of murder.[5] As Woodfill acknowledges, his argument is

---

[4] The amended information tracks the statutory language and does not provide any additional factual allegations about the alleged conduct, stating that Woodfill "did unlawfully murder [S.G.], a human being, in violation of Penal Code Section 187(a)." (Capitalization omitted.)

[5] Section 191.5 sets forth two types of vehicular manslaughter while intoxicated: (a) gross vehicular manslaughter while intoxicated, and (b) vehicular manslaughter while intoxicated. "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an

11

foreclosed by our Supreme Court's opinion in *People v. Sanchez* (2001) 24 Cal.4th 983, 988-992 (*Sanchez*). *Sanchez* held that "gross vehicular manslaughter while intoxicated should not be treated as a lesser included offense of murder." (*Id*. at p. 992.) *Sanchez* reached that conclusion because gross vehicular manslaughter while intoxicated "requires proof of *additional elements* that are not included in the offense of murder or in other forms of nonvehicular manslaughter." (*Ibid*.) Specifically, "[g]ross vehicular manslaughter while intoxicated requires proof of elements that need not be proved when the charge is murder, namely, use of a vehicle and intoxication." (*Id*. at p. 989; see also *People v. Hicks* (2017) 4 Cal.5th 203, 209 & fn. 1 [citing *Sanchez* for the proposition that a gross vehicular manslaughter conviction was not a lesser included offense of murder because it "required proof of elements that did not need to be proved to convict defendant of murder"].) As case law has recognized, the reasoning of *Sanchez* applies equally to other types of vehicular manslaughter (§§ 191.5, subd. (b), 192, subd. (c)), as they all require proof of an element not required for murder, namely, the driving

---

unlawful manner, and with gross negligence." (§ 191.5, subd. (a).) "Vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, but without gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, but without gross negligence." (§ 191.5, subd. (b).) Further, section 192, subdivision (c) sets forth three types of vehicular manslaughter, not necessarily involving intoxication. In arguing that the jury should have been instructed on vehicular manslaughter as a lesser included offense, Woodfill does not distinguish between these different types of vehicular manslaughter. Instead, he refers generally to "vehicular manslaughter" as a lesser included offense.

12

of a vehicle. (*People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1057-1060; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 685-686 (*Wolfe*).)

Woodfill acknowledges that we are bound to follow our Supreme Court's holding in *Sanchez*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, he asks us to "encourage the Supreme Court to consider and address the issue" he raises, which consists of a policy argument, including a focus on the history of the California statutes relating to manslaughter and murder. Respecting our role as an intermediate appellate court, we decline the invitation to comment any further. We find no error in the trial court's failure to instruct the jury on vehicular manslaughter as a lesser included offense of murder.

2.     *Involuntary Manslaughter*

Recognizing that we are precluded by *Sanchez, supra,* 24 Cal.4th 983, from concluding that the trial court erred by not instructing on vehicular manslaughter as a lesser included offense of murder, Woodfill's second contention is that the trial court should have instructed on involuntary manslaughter as a lesser included offense. As we will explain, Woodfill's argument is precluded by the plain statutory language of section 192, subdivision (b).

Involuntary manslaughter is a killing without malice "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In general, "[i]nvoluntary manslaughter is a lesser included offense of murder; thus, a trial court must instruct the jury on involuntary manslaughter '[i]f the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence defendant committed

13

involuntary manslaughter.' " (*People v. Munoz* (2019) 31 Cal.App.5th 143, 153-154 (*Munoz*).) However, the Legislature expressly stated in section 192, subdivision (b) that "[t]his subdivision shall not apply to acts committed in the driving of a vehicle." (§ 192, subd. (b).) Therefore, "section 192, subdivision (b) effectively eliminates involuntary manslaughter as a lesser included offense of murder when 'committed in the driving of a vehicle.' " (*Munoz*, at p. 154; see also *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1082 ["although involuntary manslaughter is usually a lesser included offense of murder [citations], in the context of drunk driving it is not"].)

Woodfill acknowledges that section 192, subdivision (b) makes the crime of involuntary manslaughter inapplicable to a vehicular killing. However, he argues that when viewed from a "historical perspective," which includes the development of the statutory provisions that separately criminalize vehicular manslaughter, the Legislature could not have intended to enact a statute that would result in there being no lesser included offense for a murder committed by the act of driving a vehicle. We understand Woodfill's argument, but it is better directed to the Legislature than to us. The plain language of section 192, subdivision (b) excludes a killing committed in the driving of a vehicle from the crime of involuntary manslaughter. It is accordingly legally impossible for a defendant to be convicted of involuntary manslaughter when charged with a murder committed in driving a vehicle. If the Legislature were to determine that the plain statutory language has the undesired effect of eliminating any lesser included offense for murder committed in the driving of a vehicle, it is free to enact a statutory amendment to address the issue.

Woodfill contends that we may "decline to follow the plain meaning of a statute in situations when following the plain meaning inevitably . . . would

14

lead to absurd results that the Legislature did not intend." (See *People v. Broussard* (1993) 5 Cal.4th 1067, 1072 ["the plain meaning of a statute should not be followed when to do so would lead to 'absurd results.' "].) "To justify departing from a literal reading of a clearly worded statute, the result must be so unreasonable that the Legislature could not have intended it." (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 638.) Here, it does not lead to a necessarily absurd result to apply the plain meaning of section 192, subdivision (b), even if the effect is to eliminate any lesser included offense for murder committed in the driving of a vehicle. As one court observed in the context of an equal protection challenge based on the absence of a lesser included offense for murder committed by a vehicle, "the Legislature's charging scheme is rationally related to a legitimate governmental purpose: to appropriately punish—and also perhaps to discourage—people from engaging in the highly dangerous conduct of driving under the influence." (*Wolfe*, *supra*, 20 Cal.App.5th at p. 690; see also *Munoz*, *supra*, 31 Cal.App.5th at p. 160 [in the context of a due process challenge to the lack of a lesser included offense, observing that "the Legislature reasonably could distinguish unintentional homicides committed in the driving of a vehicle from other unintentional homicides. Motor vehicles are a 'leading cause of accidental deaths' in this country. [Citation.] Our Supreme Court expressly has identified deterrence of driving under the influence of alcohol as 'a highly important governmental interest.' "].)

Accordingly, we follow the plain meaning of section 192, subdivision (b) to conclude that the trial court was not required to instruct on involuntary manslaughter as a lesser included offense of murder in this case. "A defendant is entitled to an instruction on a lesser included offense only if the record contains substantial evidence of the lesser crime." (*Wolfe*, *supra*,

15

20 Cal.App.5th at p. 687.) Because there was no substantial evidence to support a finding that the killing of S.G. was committed in any manner *other* than the driving of a vehicle, Woodfill's conduct could not constitute the crime of involuntary manslaughter as a lesser included offense. (*Id.* at p. 686 ["As far as the crime of involuntary manslaughter, the court was prohibited from giving that instruction because the crime does 'not apply to acts committed in the driving of a vehicle.' (§ 192, subd. (b).)"].)

C.     *The Trial Court Did Not Prejudicially Err in Admitting a Photograph of S.G. While She Was Alive*

Woodfill's final contention is that the trial court prejudicially erred in admitting a photograph of S.G. while she was alive.

In a motion in limine, defense counsel requested that the trial court exclude from evidence any photographs depicting S.G. while alive.[6] Defense counsel offered to stipulate to any fact the prosecutor might wish to establish using such a photograph. The People opposed the motion in limine, but they offered to allow the defense to choose between three proposed photographs of S.G.

The trial court ruled that it would admit one photograph of S.G. while alive, stating that "one photograph is not unduly prejudicial. I'm not going to exclude a photograph of a living individual who's an alleged victim here of

---

[6]     Defense counsel's motion in limine did not cite any specific provision of the Evidence Code, but instead relied upon case law discussing the circumstances in which it is appropriate to admit a photograph of a victim while alive. That case law generally identifies issues of relevance (Evid. Code, § 350 [no discretion to admit irrelevant evidence]) and undue prejudice (*Id.*, § 352 [discretion to exclude evidence when the probative value is substantially outweighed by the probability of undue prejudice]) as arising when the People seek to introduce a photograph of a victim while alive. (See, e.g., *People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 (*DeSantis*); *People v. Poggi* (1988) 45 Cal.3d 306, 322-323 (*Poggi*).)

16

drunk driving." The trial court explained, "I've done my fair share of murder trials and I've done my fair share of allowing a picture of a living individual who is the victim, because sometimes, and I'll just give you my analysis, we concentrate on your client throughout the whole two weeks and not enough to alleged victim or victims. So I just feel that that would be probative even though you've cited case law indicating otherwise."

A single photograph of S.G. was displayed to the jury during the testimony of S.G.'s husband, who was the first trial witness. After establishing that S.G. left the house to go running at approximately 5:00 p.m. to 5:15 p.m. on August 27, 2018, the prosecutor displayed a photograph of S.G. and asked S.G.'s husband whether he recognized it. He confirmed, "Yes, that's my wife."

We apply an abuse of discretion standard of review in determining whether the trial court erred in admitting the photograph. (*People v. Parker* (2022) 13 Cal.5th 1, 43.)

Due to the volume of death penalty appeals that come before our Supreme Court, numerous opinions discuss the issue of whether it was error for a trial court to allow the admission of a photograph of the victim while alive. Our Supreme Court has "long advised trial courts to exercise care when deciding whether to admit during the guilt phase of trial photographs of a capital murder victim while alive, because of the risk such evidence 'will merely generate sympathy for the victim[ ].' " (*People v. Brooks* (2017) 3 Cal.5th 1, 56.) Since at least 1992, our Supreme Court has followed the approach of cautioning trial courts to exercise care in admitting a photograph of a victim while alive, but nevertheless holding that a photograph of the victim while alive is "relevant to establish the witnesses' ability to identify the victims as the people about whom they were testifying" and that "[t]he

17

possibility that [the photograph] generated sympathy for the victims is not enough, by itself, to compel its exclusion if it was otherwise relevant." (*DeSantis*, *supra*, 2 Cal.4th at p. 1230; see also *People v. Tully* (2012) 54 Cal.4th 952, 1020 (*Tully*) [quoting *DeSantis*]; *People v. Thomas* (2023) 14 Cal.5th 327, 371-372 [photographs of victims while alive "can be relevant 'to establish the witnesses' ability to identify the victims as the people about whom they were testifying.' "].)

In assessing the relevance of victim photographs while alive, older case law from our Supreme Court—on which Woodfill relies—takes into account whether the defendant offered to stipulate to any facts that the People sought to establish through the disputed photograph. (*People v. Ramos* (1982) 30 Cal.3d 553, 577-578 [error to admit a photograph of the victim while alive during her father's testimony when the defense offered to stipulate the victim was a human being and was alive prior to the events of the night in question]; *Poggi*, *supra*, 45 Cal.3d at pp. 322-323 [error to admit a photograph of the victim while alive "for 'identification' " when the defense offered to stipulate to the fact that the victim was a human being, that she was alive before the attack, and that she had died].) However, our Supreme Court's more recent case law has not followed that approach, concluding that admission of a victim's photograph is relevant to establish a witness's ability to identify the victim, *even when* the defense offers to stipulate to identity. (*Tully, supra,* 54 Cal.4th at p. 1020 [even though defense counsel offered to stipulate to identity, victim photograph was properly admitted to show identity of victim]; *DeSantis*, *supra*, 2 Cal.4th at p. 1230 [same].)[7]

---

[7]     As the issue of the admissibility of a victim photograph typically involves an objection made under Evidence Code section 352, our Supreme Court's case law considering the admissibility of victim photographs while

18

Citing our Supreme Court's case law, Woodfill acknowledges that a photograph of a victim while alive may be relevant to show that the witness can identify the victim as the person about whom the witness is testifying. However, he argues the photograph of S.G. was not relevant for that purpose because "[t]he prosecutor made no showing that [S.G.'s husband] needed to see the photograph in order to be able to be made aware of who his wife was." Accordingly, Woodfill argues "[t]here was no need to use [the photograph] to allow [S.G.'s] husband to identify his wife." Woodfill argues that because the photograph was not relevant, the trial court erred in admitting it.[8]

In our assessment, the relevance of the photograph is a close question. The People's only argument concerning the relevance of the photograph is that it was admitted "so that [S.G.'s] husband could identify her for the jury." However, that is not the correct inquiry under the case law. As our Supreme Court has explained, victim photographs are "relevant to establish the

_____

alive typically addresses the issue of whether the photograph was unduly prejudicial after discussing whether the photograph was relevant. (See, e.g., *People v. Suff* (2014) 58 Cal.4th 1013, 1072-1073.) Here, however, Woodfill focuses his argument only on the issue of relevance, arguing that the photograph should have been excluded because it had no relevance whatsoever, regardless of whether it was more prejudicial than any typical photograph of a victim while alive. We note that there is nothing unduly prejudicial about the photograph, as it is an ordinary photograph that appears to have been taken as a "selfie" with a cell phone camera, depicting the face and upper body of a woman with a neutral expression.

[8]    In arguing that the photograph was not relevant, Woodfill also points out that he offered to stipulate to any fact that the People sought to establish through the admission of the photograph. However, as we have explained, a defendant's stipulation along those lines is no longer treated as dispositive on the issue of whether the admission of a photograph is relevant to prove a witness can identify the victim as the person who is the subject of the witness's testimony. (*Tully*, *supra*, 54 Cal.4th at p. 1020; *DeSantis*, *supra*, 2 Cal.4th at p. 1230.)

19

witnesses' ability to identify the victims as the people about whom they were testifying." (*DeSantis*, *supra*, 2 Cal.4th at p. 1230.) The inquiry is not whether the photograph is relevant so that a witness can identify the victim "*for the jury*." Here, there is no dispute that S.G. was the person to whom S.G.'s husband was married, and that S.G. was the person who left their house for a run and did not come back. Showing S.G.'s husband a photograph of S.G. to identify her was not material to confirm those facts, and thus the photograph was not relevant "to establish the witness['s] ability to identify the victim[ ] as the [person] about whom [he was] testifying." (*Ibid*.)

However, even were we to conclude that the trial court erred in determining that the photograph was relevant, Woodfill has not met his burden to establish that any error in admitting the photograph was prejudicial. In determining whether an error in admitting a photograph of a victim while alive requires that the judgment be reversed, we inquire whether it is "reasonably probable that the outcome would have been more favorable to defendant had the photograph been excluded." (*DeSantis*, *supra*, 2 Cal.4th at p. 1231.)

Here, the photograph is a plain and unremarkable photograph depicting S.G. while she was alive. As such, the photograph was unlikely to generate any additional sympathy from the jury above and beyond the tragic fact of S.G.'s death and the presence of S.G.'s grieving husband on the witness stand. (See *People v. Cowan* (2010) 50 Cal.4th 401, 477 [concluding that the admission of a photograph showing one of the victims while alive was not prejudicial because "the photograph would have generated no more sympathy for the victims than did [the victims'] children and grandchildren testifying live from the witness stand"]; *People v. Thompson* (1988) 45 Cal.3d 86, 115 [a photograph which was "simply a picture of the victim alive" "did

20

not unduly prejudice the defendant in any way"]; *People v. Hovey* (1988) 44 Cal.3d 543, 571 [the victim's "photo, though perhaps 'charming,' was nonetheless an 'ordinary' one not likely to produce a prejudicial impact"]; *Poggi*, *supra*, 45 Cal.3d at p. 323 [a photograph of the victim while alive did not "seem likely to have appreciably intensified whatever feelings—whether of hostility toward defendant or sympathy toward his victim—that the jury may have developed in this case."].) Moreover, the jury was shown images of S.G.'s body at the scene of the accident and during the autopsy. Woodfill does not challenge the admission of those photographs on appeal. It is unlikely that the ordinary photograph of S.G. while alive could have appreciably added to the emotional impact on the jury of the graphic photographs depicting the injuries that Woodfill caused S.G. to suffer. For these reasons, it is not reasonably probable that Woodfill would have obtained a more favorable result had the trial court granted his request to exclude the photograph of S.G. while alive.

Accordingly, we conclude that the trial court did not prejudicially err in admitting a photograph of S.G. while she was alive.

## DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DATO, J.